The STATE of Ohio, Appellee,

v.

CRUSOE, Appellant.

[Cite as *State v. Crusoe,* 150 Ohio App.3d 208, 2002-Ohio-6389.]

Court of Appeals of Ohio,
Second District, Montgomery County.

No. 19202.

Decided Nov. 22, 2002.

Andrew T. French, Montgomery County Assistant Prosecuting Attorney, for appellee.

Arvin S. Miller, Montgomery County Assistant Public Defender, for appellant.

WOLFF, Presiding Judge.

{¶ 1}   Daryl A. Crusoe pleaded no contest to possession of cocaine, a second degree felony.  He was found guilty and sentenced to three years' imprisonment.

{¶ 2}   On appeal, Crusoe advances the following assignment of error and issue for review:

{¶ 3}   "The trial court erred in overruling appellant's motion to suppress evidence recovered by the illegal search and seizure of his person.

{¶ 4}   "Did the Dayton police officers violate Mr. Crusoe's Fourth Amendment rights by searching him during the execution of a search warrant when he was not identified in the warrant and the warrant did not give authority to search all people found at that location?"

{¶ 5}   In its appellate brief, the state has not responded to Crusoe's assignment of error on the merits.  Rather, it contends that the issue has been waived because it was not raised in the trial court.

{¶ 6}   The state stood by its waiver argument when this case was orally argued but also presented brief argument on the merits.  Prior to the evidentiary hearing, counsel for Crusoe stated that the issue was "how the execution of the warrant is an infringement of my client's rights."  In our judgment, this statement put the state and trial court on notice of the issue presented here.  Indeed, the trial court stated in its decision and order denying the motion to suppress:

{¶ 7}   "[T]he police procedures followed in carrying out the search warrant were warranted under these circumstances and consistent with necessary safety precautions taken by police in the execution of their duties."  We conclude that Crusoe has not waived the issue he presents here.

A

{¶ 8}   Essentially, Crusoe argues that the seizure of cocaine from his pocket was accomplished only because the police exceeded their prerogative to pat him down for their personal safety.  See *Terry v. Ohio* (1968), 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889.

{¶ 9}   The facts are not in dispute.  The police secured a search warrant to search 1101 Riverside Dr. Apt. C and " 'Spanky' W/M 47–50 yrs."  The warrant authorized the police to search for crack cocaine, other controlled substances, and other items related to the drug trade.  Crusoe was not named in the warrant.

{¶ 10}   In executing a search warrant, it is standard procedure for the police to order all occupants of the premises to the floor, handcuff them, and pat them down for officer safety purposes.   The occupants are then placed in a room, "field interrogated," and "(run) for any wants or warrants."

{¶ 11}   When the police entered the apartment, Crusoe and one Wooliver were in the kitchen.   Officer Braun dealt with Wooliver, who had a gun in his pocket, and Officer Kowalski dealt with Crusoe.

{¶ 12}   Officer Kowalski testified as follows:

{¶ 13}   "I patted him down, felt him for any objects which I recognized to be weapons, or any objects which I recognized to potentially to be in the form of containers which may contain drugs or anything such as that.

{¶ 14}   "* * *

{¶ 15}   "Trying to recognize any indication of weapons or anything, containers, or items which I recognized to contain drugs because that is what we were there for in the search warrant.

{¶ 16}   "* * *

{¶ 17}   "When I did reach his right front sweat pant pocket, I felt an object, a chunky object that I did hear rustling of a plastic bag, which after more than a year of working drugs, and I also worked the street for another seven, and I recognized that to be similar to packaging which is used to package crack cocaine. I asked Mr. Crusoe what he had in his pocket.   And I received no answer.

{¶ 18}   "* * *

{¶ 19}   "Okay.   Did you do the whole body before you put your hand in his right pocket?

{¶ 20}   "A.   Yes.

{¶ 21}   "Q.   Why? Why was that?

{¶ 22}   "A.   Well, my main concern, since we already found one loaded weapon, was to first obtain, or see if I could locate another loaded weapon on Mr. Crusoe.   Since that seemed to be the pattern there in that house and also knowing that we were there for drugs, for the purpose of drugs, and drug sales coming from the house, the pat down was to recognize any, any contraband.

{¶ 23}   "Q.   Did you feel anything on Mr. Crusoe that indicated that anything was a weapon?

{¶ 24}   "A.   No.

{¶ 25}   "Q.   And is the right front pocket the only pocket you went in?

{¶ 26}   "A.   No.

{¶ 27}  "Q.  What other pockets did you go inside?

{¶ 28}  "A.  His left front pant pocket.  We do his pockets that the money that was on him.

{¶ 29}  "Q.  Okay. How many bills were there?

{¶ 30}  "A.  I have no idea how many bills there were.

{¶ 31}  "Q.  I mean, was it like, was it kept as a money roll?  Or was it just a few loose bills?

{¶ 32}  "A.  I believe in his left pocket he had the larger bills neatly folded, twenty's, ten's.  In his right pocket, which is where his crack was, it was like crumpled up one dollar bills.

{¶ 33}  "Q.  How thick were they?  In the left pocket how thick were the bills?  You said they were folded up.  Were they folded up like in a big large stack?  Or were they more or less loose?

{¶ 34}  "A.  They were folded dollar bills.

{¶ 35}  "Q.  How many?

{¶ 36}  "A.  I would have to check the inventory.  I don't know for sure.  I can't remember.

{¶ 37}  "Q.  Could you tell that it wasn't a weapon from patting the left pocket?

{¶ 38}  "A.  Sure.

{¶ 39}  "Q.  Could you tell from feeling the right pocket it wasn't a weapon?

{¶ 40}  "A.  I didn't know.

{¶ 41}  "Q.  You didn't know, or no, you couldn't tell?

{¶ 42}  "A.  Well—

{¶ 43}  "Q.  Which is your answer?

{¶ 44}  "A.  Well, could you repeat the question.

{¶ 45}  "Q.  Did you know from the right pocket, from the touching of the clothes, did you—did you know that there was a weapon in there or that there was not a weapon in there?  Could you tell?

{¶ 46}  "A.  I did not know there was a weapon in there, no.  But whatever item that was, I recognized to be similar to the packaging of crack cocaine.  But until that item was revealed to me, I wasn't sure what it was.

{¶ 47}  "Q.  Okay. So what indicates to you that a person may have crack cocaine in their pockets?  What do you have to observe or feel?

{¶ 48} "A. Well, number one, when we go into a crack house, or where crack is being sold from, I know that any items which is [sic] a chunky rock type substance similar to soap, I can feel that item through a thin plastic bag through sweat pants.

{¶ 49} "* * *

{¶ 50} "What—how do you feel a plastic bag through the sweat pants?

{¶ 51} "A. You can hear a plastic bag through sweat pants. When you roll your fingers over it, plastic just slides.

{¶ 52} "Q. Okay. Did you hear it slide that day?

{¶ 53} "A. I could hear the plastic crinkling, yes.

{¶ 54} "Q. What—the point here is what could a person have in their pockets when you are feeling on the outside that it would indicate to you that it night [sic] not be crack cocaine? I mean, coins, a piece of paper with a telephone number on it? What could be on the person that would indicate to you that it is not crack cocaine and you would just keep going?

{¶ 55} "A. I don't think I can really answer that fairly to—it's a judgment that I make in an instant second. I don't have a plan on that as far as knowing what item would indicate to me what is not crack cocaine.

{¶ 56} "Q. Obviously, an empty pocket, nothing there would indicate that there is no crack cocaine there?

{¶ 57} "A. Correct. If there's an empty pocket, I would assume an empty pocket.

{¶ 58} "Q. That is, nothing there would cause you not to search any further, correct?

{¶ 59} "A. (No verbal response.)

{¶ 60} "Q. My question is what is empty—what is a person allowed to have for you to feel in their pockets before you're going to look in the pockets?

{¶ 61} "A. I use my own discretion at the time. There's no situation—I don't have a set pattern or plan. It's a discretionary decision that I make at the moment.

{¶ 62} "Q. Let me ask you, how many search warrants have you executed in your career?

{¶ 63} "A. Probably right around a hundred.

{¶ 64} "Q. Has there been a time when you're patting someone down and you have not gone inside their pockets?

{¶ 65} "A. Yes.

{¶ 66} "Q. What was different about that case than Mr. Crusoe's case?

{¶ 67} "A. One, when there's nothing in the pockets, I don't go in the pockets.

{¶ 68} "Q. So, that is the empty pockets. Then what else is different?

{¶ 69} "A. I use my discretion at that moment if something is found in the pocket, discretion based on what the item feels like and what I recognize it to be. I can't answer your question any other way.

{¶ 70} "Q. When you are—I understand.

{¶ 71} "When you are doing these pat downs, and you're saying you have done a hundred, has there ever been a time when you have felt something that in your discretion has not felt to you like crack cocaine?

{¶ 72} "A. Yes.

{¶ 73} "Q. Okay. What did that feel like?

{¶ 74} "A. Paper, just an empty piece of paper."

{¶ 75} At some point after the crack cocaine was removed from Crusoe's pocket, it was learned that there was an active warrant for Crusoe's arrest.

## B

{¶ 76} The trial court provided no explanation, other than as quoted above, for implicitly determining that the crack cocaine was lawfully seized. The state has not asserted in its brief a theory upon which the seizure can be justified. At oral argument, the state offered the "plain-feel" exception to the warrant requirements as justification.

{¶ 77} We believe that Crusoe is correct that the police exceeded the bounds of a lawful *Terry* search in order to seize the crack cocaine. In *Minnesota v. Dickerson* (1993), 508 U.S. 366, 113 S.Ct. 2130, 124 L.Ed.2d 334, the case that recognized the plain-feel exception to the warrant requirement, the court stated:

{¶ 78} "*Terry* further held that '[w]hen an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others,' the officer may conduct a patdown search 'to determine whether the person is in fact carrying a weapon.' 392 U.S., at 24, 88 S.Ct., at 1881 [20 L.Ed.2d 889]. 'The purpose of this limited search is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence....' *Adams* [*v. Williams*], [407 U.S. 143] *supra*, at 146, 92 S.Ct. [1921], at 1923 [32 L.Ed.2d 612]. Rather, a protective search—permitted without a warrant and on the basis of reasonable

suspicion less than probable cause—must be strictly 'limited to that which is necessary for the discovery of weapons which might be used to harm the officer or others nearby.' *Terry, supra,* at 26, 88 S.Ct., at 1882 [20 L.Ed.2d 889]; see also *Michigan v. Long,* 463 U.S. 1032, 1049, and 1052, n. 16, 103 S.Ct. 3469, 3480– 3481, and 3482, n. 16, 77 L.Ed.2d 1201 (1983); *Ybarra v. Illinois,* 444 U.S. 85, 93– 94, 100 S.Ct. 338, 343–344, 62 L.Ed.2d 238 (1979). If the protective search goes beyond what is necessary to determine if the suspect is armed, it is no longer valid under *Terry* and its fruits will be suppressed. *Sibron v. New York,* 392 U.S. 40, 65–66, 88 S.Ct. 1889, 1904, 20 L.Ed.2d 917 (1968).

{¶ 79} "These principles were settled 25 years ago when, on the same day, the Court announced its decisions in *Terry* and *Sibron.* The question presented today is whether police officers may seize nonthreatening contraband detected during a protective patdown search of the sort permitted by *Terry.* We think the answer is clearly that they may, so long as the officers' search stays within the bounds marked by *Terry.*

{¶ 80} "* * *

{¶ 81} "If a police officer lawfully pats down a suspect's outer clothing and feels an object whose contour or mass makes its identity immediately apparent, there has been no invasion of the suspect's privacy beyond that already authorized by the officer's search for weapons; if the object is contraband, its warrantless seizure would be justified by the same practical considerations that inhere in the plain-view context." Id. at 373, 375–376, 113 S.Ct. 2130, 124 L.Ed.2d 334.

{¶ 82} We find no fault with the police practice of ordering the occupants of a drug house to the floor, handcuffing them, and patting them down for weapons. By his own testimony, however, the patdown Officer Kowalski did upon Crusoe exceeded what was necessary to assure Officer Kowalski that Crusoe was not armed. Indeed, by his own testimony, Officer Kowalski was looking for drugs as well as weapons. Furthermore, it is not demonstrated by Officer Kowalski's testimony that the identity of the object in Crusoe's pocket as crack cocaine was immediately apparent to Officer Kowalski upon his touching Crusoe's pocket. Thus, the seizure of the cocaine cannot be justified on the authority of *Minnesota v. Dickerson.*

## C

{¶ 83} Nor on this record can the seizure be justified on the strength of the inevitable discovery doctrine. In *Nix v. Williams* (1984), 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377, the court held:

{¶ 84}  "If the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means—here the volunteers' search—then the deterrence rationale has so little basis that the evidence should be received."  Id. at 444, 104 S.Ct. 2501, 81 L.Ed.2d 377.

{¶ 85}  Here, there was an outstanding warrant for Crusoe's arrest, which would have justified a search incident to arrest pursuant to that arrest warrant.

{¶ 86}  The state did not attempt to establish that the police would have ultimately or inevitably discovered the cocaine had Crusoe been searched incident to an arrest pursuant to the arrest warrant.  Nor does the state argue inevitable discovery on appeal.

{¶ 87}  On similar facts, the trial court in *State v. Lynch* (June 6, 1998), Montgomery App. No. 17028, 1998 WL 288936, determined that "there (was) insufficient evidence that (drugs—described as 'small and easily moveable') would have been ultimately and inevitably discovered in the absence of police misconduct, as Defendant could have relocated them or otherwise disposed of them."  We deferred to the trial court's discretion in making that finding and affirmed the order of suppression.  In the absence of any evidence that the police would have ultimately or inevitably discovered the crack cocaine through a search incident to Crusoe's arrest on the arrest warrant, the seizure cannot be justified on the authority of *Nix v. Williams.*

D

{¶ 88}  The assignment of error is sustained.

{¶ 89}  The judgment will be reversed, and this matter will be remanded for further proceedings consistent with this opinion.

Judgment reversed
and cause remanded.

FAIN and GRADY, JJ., concur.