[Cite as *State v. Mallory*, 2020-Ohio-4848.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 28685 |
| | : | |
| v. | : | Trial Court Case No. 2018-CR-3323 |
| | : | |
| KELSEY DEVON MALLORY | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 9th day of October, 2020.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by JAMIE J. RIZZO, Atty. Reg. No. 0099218, Assistant Prosecuting Attorney, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, 5th Floor, Dayton, Ohio 45422
        Attorney for Plaintiff-Appellee

JEFFREY R. MCQUISTON, Atty. Reg. No. 0027605, 130 West Second Street, Suite 1818, Dayton, Ohio 45402
        Attorney for Defendant-Appellant

. . . . . . . . . . . . .

DONOVAN, J.

{¶ 1} Kelsey Devon Mallory appeals from the trial court's December 23, 2019 judgment convicting him, following his no contest pleas, of one count of aggravated possession of drugs (5 times bulk but less than 50 times bulk), in violation of R.C. 2925.11(A), a felony of the second degree (Count 1), and two counts of aggravated possession of drugs (bulk but less than five times bulk), felonies of the third degree (Counts 2 and 3). Mallory was sentenced to a mandatory term of two years on Count 1 and to nine months each on Counts 2 and 3, all to be served concurrently. For the reasons outlined below, we reverse Mallory's conviction and remand the matter to the trial court for further proceedings.

{¶ 2} Mallory was indicted on November 6, 2018. He filed a motion to suppress on April 30, 2019, and the trial court held a suppression hearing on May 13, 2019. At the hearing, Ray Swallen testified that he was a detective with the Miami Township Police Department and also a task force officer with the Miami Valley Bulk Smuggling Task Force with the United States Department of Homeland Security. He testified about the task force's goals of finding "outlets where people are bringing in drugs, humans, guns, ammunition or exporting the same from the Miami Valley region."

{¶ 3} Swallen further testified that, on May 24, 2018, he boarded "the Detroit bus" at the Greyhound bus station in Trotwood upon its arrival, after gaining permission from the driver of the bus. Swallen testified that, in general, task force officers "were boarding most of the buses," but in particular they had found large amounts of drugs coming south from Detroit and a lot of currency and guns going northbound back to Detroit. Task force officers had been told there was "a network of people going to Nashville and Lexington from Detroit." Swallen, who was in plain clothes and displayed his task force badge,

testified that he "walked immediately to the rear of the bus" that had arrived from Detroit and began to speak to each passenger. He testified that he advised the passengers that he was with Homeland Security and asked for their names, their tickets, and whether they had luggage.

{¶ 4} After speaking to a few other passengers, Swallen encountered Mallory and asked for his name. According to Swallen, Mallory said his name was Williams, but "wasn't able to give [Swallen] his first name" despite multiple requests; "[h]e just kind of made a noise." Swallen also noticed that Mallory's ticket was from Detroit to Nashville, but when Swallen asked Mallory about his destination, Mallory stated that he was going to Lexington to visit family. Swallen testified that, when he asked Mallory where specifically in Lexington he was going, Mallory did not respond. Swallen asked Mallory if he had any luggage, and Mallory indicated he had one bag. When Swallen asked if he could "check" the bag, Mallory "grabbed it off the floor," put it on the seat beside him, opened the bag, and started looking through it. Swallen asked again if he could look through the bag; Mallory first showed him clothes and other items, then consented to Swallen's looking in the bag. Swallen found a sock containing pills.

{¶ 5} Swallen testified that he did not direct Mallory to open the bag. He further testified:

> Q [PROSECUTOR]. And why did you ask him to hand it over to you versus letting him do it himself?
>
> A [SWALLEN]. I don't know if there's guns. I don't know what's in the bag.
>
> Q. And did you convey that to him - -

A.   Yes.

Q.   - - about your concern?

A.   I did.

Q. * * * And did he hand you the bag, or did you take it from him?

A.   It was still there on the seat still.

Q.   Okay.

A.   I took control of it, yes.

{¶ 6} Swallen testified that there were clothing and other effects in the bag, and he felt a pair of socks with pills in it.   Swallen testified that the contents of the sock were obvious to him when he touched it, having made "hundreds of pill arrests" in his career, including large quantities, "numerous vacuum sealed packs of it," and pills hidden in jeans pockets and "hidden all over."   Swallen testified that Mallory's sock contained a bag with multiple types of pills.   Swallen then secured Mallory and escorted him to a break room in the bus station; Mallory confirmed his actual identity at that time.   Swallen testified that he advised Mallory of his rights, and that Mallory stated that he did not want to talk with Swallen anymore.   At the hearing, Swallen identified photographs of the pills Mallory had been carrying and of Mallory's ticket bearing the name "Justin Williams."

{¶ 7} On cross-examination, Swallen denied that Mallory was being sarcastic when he told him that he was going to Kentucky.   The following exchange occurred with respect to Swallen's questioning of Mallory about his luggage:

Q [DEFENSE COUNSEL]. * * * And did he tell you how many [bags he had]?

A.   He said just the one.

Q.   * * * And that bag was located down on the floor between his feet, correct?

A.   I don't recall exactly where it was.   It was on the floor.

Q.   * * * And when you asked if he had any bags he tells you that he has the one bag.   Did you order him to bring it up?

A.   No, I asked if I could look at it.

Q. * * * So it's still on the ground, and you ask can you look at it, and that's when he brings it up?

A.   Yes.

{¶ 8} When asked if Mallory consented to the search of the bag, Swallen testified, "I asked him one time and he opened the bag and started showing me what was in it." Swallen also testified that, in the course of the encounter, he (Swallen) stood in a row of seats behind Mallory's seat, for two reasons: he could lean over and see what's going on; and if something happened, he could back up and there would be "something between" the two men.   Swallen pointed out that he was "six foot nine" and could "lean over and look pretty well."

{¶ 9} Mallory testified at the hearing on his own behalf, stating that he lived in Warren, Michigan.   He testified that on May 24, 2018, Swallen "jumped on the bus" and spoke to one or two people before approaching Mallory.   Mallory stated that there were about 20 people on the bus.   Mallory stated that Swallen stood between his seat and the bathroom.   Mallory removed his ticket from his hoodie and gave it to Swallen when asked for it.   Mallory acknowledged telling Swallen that his name was "Williams" and his destination was Kentucky.   Mallory stated he was being sarcastic when he said he was going to Kentucky, because his actual destination was on his ticket.   Mallory testified that he told Swallen he had one bag, which was between his legs on the floor; Mallory grabbed

it from the floor, put it on the seat beside him, retrieved a bottle of Mountain Dew from the backpack, and then that zipped the pack closed. Mallory stated that Swallen asked him three times to search the bag. According to Mallory, in response to the first request, he said "huh-uh, meaning no." Mallory testified that, in response to the second request, he gave Swallen "a head gesture saying no." According to Mallory, in response to the third request, Mallory said nothing, and that was when Swallen grabbed the bag and found the sock. Mallory testified that Swallen unzipped the pack when it was fully closed. On cross-examination, Mallory acknowledged that his ticket was not issued in his name.

{¶ 10} On September 18, 2019, the trial court denied Mallory's motion to suppress, indicating that it found the testimony of Swallen "credible in every material respect" and did not find Mallory's testimony credible. Regarding any inconsistencies between the witness's testimonies, the court credited Swallen's version of the events. The court concluded that Swallen's search of Mallory's backpack "comport[ed] with the constitutional dictates set forth in *Terry v. Ohio*," 392 U.S. 1, 26, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)

{¶ 11} In its factual findings, the court noted that Swallen did not perceive Mallory's statement that he was going to Kentucky to be sarcastic, and the court also did not believe it to have been such. The court also found that Swallen's "immediate identification of the pills in the sock [was] consistent with his considerable experience." With respect to Mallory's arguments that his stop was unconstitutional, the trial court concluded:

> b. Unlawful Stop
>
> * * *
>
> * * * The bus driver stopped the bus at the Trotwood station in the

ordinary course of the bus' scheduled journey. Ofc. Swallen[1] did not stop the bus and [*State v.*] *Cavanaugh*[, 2d Dist. Montgomery No. 16622, 1998 WL 127075 (Mar. 20, 1998)] makes it quite clear Ofc. Swallen's actions upon entering the bus and encountering passengers including Mr. Mallory were entirely constitutional. And a reasonable passenger, given [the] facts and circumstances of the encounter here, would feel free to refuse any interaction with Ofc. Swallen.

c. Consent

The Court finds, as a matter of fact, that Mr. Mallory did not consent to the search of his backpack by Ofc. Swallen. But as noted above, his consent was unnecessary given the time-honored dictates of *Terry*.

Ofc. Swallen was working the Detroit to Nashville "pipeline" in which drugs, weapons, money and humans are transported and trafficked. This Court takes judicial notice of the nexus between activity of this nature and the presence of weapons that place law enforcement personnel at considerable personal risk in the discharge of their duties. As the result of his brief encounter with Mr. Mallory, Ofc. Swallen had learned Mr. Mallory was unable to give his complete name and was traveling on a Nashville ticket and yet told Ofc. Swallen he was traveling to Kentucky. Taking into account the totality of these circumstances including Mr. Mallory's suspicious behavior, Ofc. Swallen was righteous in continuing his

---

[1] The trial court's decision sometimes refers to the detective as Officer "Swollen" rather than Swallen; we have corrected this misspelling in our quotation of the decision.

investigation and pursuant to *Terry* he had every right to ensure the absence of any weapons in Mr. Mallory's backpack. Upon conducting his limited *Terry* search of the backpack, Ofc. Swallen immediately discovered the concealed contraband which he immediately recognized as pills based upon his considerable experience at interdicting drug traffickers.

  d. Miranda

   \* \* \*

  Mr. Mallory was not detained by Ofc. Swallen until the contraband was detected as the result of a perfectly constitutional *Terry* search of the backpack. At that point, Mr. Mallory was properly *Mirandized* and invoked his right to silence.

  Any earlier questioning by Ofc. Swallen was in the context of a consensual encounter during which Mr. Mallory was not in custody and under circumstances where he could have simply declined to engage with Ofc. Swallen. In short, before the *Terry* search of the backpack, Mr. Mallory's encounter with Ofc. Swallen was voluntary and consensual and it was not necessary he be *Mirandized*.

(Footnotes omitted.)

{¶ 12} After Mallory's motion to suppress was denied, he entered no contest pleas on November 15, 2019. He was sentenced as described above on December 19, 2019.

{¶ 13} Mallory asserts a single assignment of error as follows:

  THE TRIAL COURT ERRED IN DENYING DEFENDANT'S MOTION TO SUPPRESS THE ILLEGALLY OBTAINED EVIDENCE IN THAT

THERE WAS NO EVIDENCE TO SUPPORT A REASONABLE AND ARTICULABLE SUSPICION OF CRIMINAL ACTIVITY NOR WAS THERE EVIDENCE TO SUPPORT A REASONABLE SUSPICION THAT THE DEFENDANT WAS ARMED AND DANGEROUS.

{¶ 14} Mallory asserts that the State's justification for the search of Mallory's backpack was that he had consented to the search.  But the trial court rejected that argument.  As such, the question became whether some alternate justification applied. According to Mallory, the circumstances in this case did not support a finding that the encounter was consensual or that he was under arrest; consequently, the police-citizen interaction in this case involved a brief investigatory stop or detention pursuant to *Terry*. Mallory argues that his giving the officer a wrong name in response to the officer's question could have "properly be characterized as unusual," but it did not "rise to the level of articulable suspicion that criminal activity ha[d] occurred or [was] about to occur within the meaning of *Terry*."  Mallory argues that "the giving of an unsworn false statement is not, in itself, a crime."

{¶ 15} Mallory further argues that the "only other fact that was unusual in this case" was that he indicated that he was going to Kentucky when his ticket "clearly showed that he was traveling from Detroit to Nashville."  Mallory argues that "[i]t cannot be said that [he] was intending to deceive the officer in stating that he was going to Kentucky inasmuch as the officer was holding the ticket in his hand at the time the statement was made" which showed his true destination, and his statement about his destination could not have reasonably supported a determination that criminal activity had occurred or was about to occur.  Mallory also argues that *Terry* requires a reasonable suspicion that a suspect

may be armed and dangerous, not merely that criminal activity is afoot, and that there was no evidence in his case to support a reasonable suspicion that he might have been armed and dangerous. He argues that Swallen's search of the backpack for weapons was not justified, and because the search for weapons was not justified, all subsequent discovery of contraband was subject to suppression.

{¶ 16} The State responds that Detective Swallen had a reasonable, articulable suspicion that Mallory was trafficking in drugs, and "because of the nexus between drug trafficking and guns," he therefore had reasonable suspicion that Mallory had a gun. The State further asserts that Swallen's seizure of the pills was also lawful, because the "criminality of the pills was immediately apparent to Det. Swallen" pursuant to the plain feel doctrine.

{¶ 17} In reply, Mallory asserts that, even recognizing that the Detroit to Nashville route was a known drug trafficking route and considering Mallory's "misstatement" of his destination, these facts still did not support a finding of reasonable articulable suspicion of criminal activity. Mallory argues that the recognized nexus between drug trafficking and guns "has no applicability in the absence of the predicate, namely that Swallen had specific reasonable and articulable suspicion that [Mallory] was engaged in drug trafficking." Finally, Mallory asserts that there was no evidence in the record that Det. Swallen had reason to believe that he was armed and dangerous, "which would have permitted a weapon search limited in scope to that protective purpose."

{¶ 18} This Court has previously noted:

Appellate review of a trial court's decision regarding a motion to suppress evidence involves mixed questions of law and fact. *State v.*

*Long*, 127 Ohio App.3d 328, 332, 713 N.E.2d 1 (4th. Dist. 1998). When ruling on a motion to suppress evidence, a trial court assumes the role of trier of fact and is in the best position to resolve questions of fact and to evaluate the credibility of witnesses. *State v. Treesh*, 90 Ohio St.3d 460, 472, 739 N.E.2d 749 (2001). Accordingly, reviewing courts must defer to the trial court's findings of fact if competent, credible evidence exists to support the findings. *State v. Dunlap*, 73 Ohio St.3d 308, 314, 652 N.E.2d 988 (1995). A reviewing court then must independently determine, without deference to the trial court, whether the trial court properly applied the substantive law to the facts of the case. *Long*, at 332, 713 N.E.2d 1.

The credibility of the witnesses and the weight to be given to their testimony are matters for the trier of facts to resolve. *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967). In *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 WL 476684 (Aug. 22, 1997), we observed: "Because the factfinder * * * has the opportunity to see and hear the witnesses, the cautious exercise of the discretionary power of a court of appeals * * * requires that substantial deference be extended to the factfinder's determinations of credibility. The decision whether, and to what extent, to credit the testimony of particular witnesses is within the peculiar competence of the factfinder, who has seen and heard the witness."

*State v. Reed*, 2016-Ohio-7416, 72 N.E.3d 1196, ¶ 21-22 (2d Dist.).

{¶ 19} This Court has further noted:

The Fourth Amendment to the United States Constitution and Article I, Section 14 of the Ohio Constitution guarantee the right to be free from unreasonable searches and seizures. *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *State v. Orr*, 91 Ohio St.3d 389, 391, 745 N.E.2d 1036 (2001). The law recognizes three types of police-citizen interactions: 1) a consensual encounter, 2) a brief investigatory stop or detention, and 3) an arrest. *State v. Millerton*, 2015-Ohio-34, 26 N.E.3d 317, ¶ 20 (2d Dist.).

Consensual encounters occur when the police merely approach a person in a public place and engage the person in conversation, and the person remains free not to answer and to walk away. *State v. Lewis*, 2d Dist. Montgomery No. 22726, 2009-Ohio-158, ¶ 21, citing *United States v. Mendenhall*, 446 U.S. 544, 553, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980). Consensual encounters are not seizures, and the Fourth Amendment guarantees are not implicated in such an encounter. *State v. Taylor*, 106 Ohio App.3d 741, 747-749, 667 N.E.2d 60 (2d Dist.1995), citing *Mendenhall* at 554, 100 S.Ct. 1870.

Under *Terry*, police officers may briefly stop and/or temporarily detain individuals in order to investigate possible criminal activity if the officers have a reasonable, articulable suspicion that criminal activity may be afoot. *State v. Swift*, 2d Dist. Montgomery No. 27036, 2016-Ohio-8191, ¶ 10. "An individual is subject to an investigatory detention when, in view of all the circumstances surrounding the incident, by means of physical force or show

of authority, a reasonable person would have believed that he was not free to leave or [was] compelled to respond to questions." *Lewis* at ¶ 22, citing *Mendenhall* at 553, 100 S.Ct. 1870, and *Terry* at 19, 88 S.Ct. 1868. Fourth Amendment protections are implicated in an investigatory detention, *i.e.*, a *Terry* stop.

In determining whether an individual engaged in a consensual encounter or was subject to an investigatory detention, the focus is on the police officer's conduct, not the subjective state of mind of the person stopped. *State v. Ramey*, 2d Dist. Montgomery No. 26705, 2016-Ohio-607, 2016 WL 685357, ¶ 25. As we stated in *State v. Ward*, 2017-Ohio-1391, 89 N.E.3d 124, ¶ 26 (2d Dist.):

"A consensual encounter remains consensual even if police officers ask questions, ask to see the person's identification, or ask to search the person's belongings, provided 'the police do not convey a message that compliance with their requests is required.' " [*State v.*] *Westover*, 2014-Ohio-1959, 10 N.E.3d 211, at ¶ 15 [(10th Dist.)], quoting [*Florida v.*] *Bostick,* [501 U.S. 429, 435, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991)]. In this regard, "the crucial test is whether, taking into account all of the circumstances surrounding the encounter, the police conduct would 'have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.' " *Bostick* at 437, 111 S.Ct. 2382, quoting *Michigan v.*

*Chesternut*, 486 U.S. 567, 569, 108 S.Ct. 1975, 100 L.Ed.2d 565 (1988).

Whether a particular police encounter with a citizen is an investigative stop, as opposed to a consensual encounter, is fact-sensitive. *Id.* at ¶ 26; *State v. Satterwhite*, 2d Dist. Montgomery No. 15357, 1996 WL 156881, *3 (Apr. 5, 1996). "Factors that might indicate a seizure include the threatening presence of several police officers, the display of a weapon, some physical touching of the person, the use of language or tone of voice indicating that compliance with the officer's request might be required, approaching the person in a nonpublic place, and blocking the citizen's path." *State v. Cosby*, 177 Ohio App.3d 670, 2008-Ohio-3862, 895 N.E.2d 868, ¶ 13 (2d Dist.), citing *Mendenhall.*

*State v. Weisgarber*, 2d Dist. Montgomery No. 27525, 2017-Ohio-8764, ¶15-19.

**{¶ 20}** As this Court has further noted:

Also, during a *Terry* stop, it is sometimes considered reasonable for the investigating officer to conduct a "protective search" by patting down the suspect to discover and remove weapons. *State v. Robinette*, 80 Ohio St.3d 234, 685 N.E.2d 762 (1997); *State v. Andrews*, 57 Ohio St.3d 86, 89, 565 N.E.2d 1271, 1274 (1991). The primary purpose of a protective search and seizure is to assure public and officer safety.

"Pursuant to *Terry,* police officers are allowed to perform limited protective searches for concealed weapons when the surrounding circumstances create a suspicion that an individual may be armed and

dangerous." *State v. Harding*, 180 Ohio App.3d 497, 2009-Ohio-59, 905 N.E.2d 1289 (2d Dist.), overruled on other grounds, *State v. Gardner*, 2d Dist. Montgomery No. 24308, 2011-Ohio-5692.

"The authority to stop an individual does not necessarily equate to authority to search the individual." (Citations omitted.) *State v. Lovins*, 2d Dist. Montgomery No. 23530, 2010-Ohio-3916, ¶ 12. *See also, State v. Stewart,* 2d Dist. Montgomery No. 19961, 2004-Ohio-1319, ¶ 16; *State v. Byrd*, 2d Dist. Montgomery No. 24583, 2012-Ohio-2659. Once a lawful stop has been made, the police may conduct a limited protective search for concealed weapons if the officer reasonably believes that the suspect may be armed or a danger to the officer or to others. *State v. Evans*, 67 Ohio St.3d 405, 618 N.E.2d 162 (1993); *State v. Molette*, 2d Dist. Montgomery No. 19694, 2003-Ohio-5965, ¶ 13.

"The purpose of this limited search is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence * * *." *Evans*, 67 Ohio St.3d at 408, 618 N.E.2d 162, quoting *Adams v. Williams*, 407 U.S. 143, 146, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972); *see also, State v. Olden*, 2d Dist. Montgomery No. 23137, 2010-Ohio-215, ¶ 25. In other words, "the protective pat down under [*Terry*] is limited in scope to its protective purpose and cannot be employed by the searching officer to search for evidence of crime." *State v. Holley*, 2d Dist. Montgomery No. 20371, 2004-Ohio-4264, ¶ 10.

"The frisk, or protective search, approved in *Terry* is limited in scope

to a pat-down search for concealed weapons when the officer has a reasonable suspicion that the individual whose behavior he is investigating at close range may be armed and dangerous.   While probable cause is not required, the standard to perform a protective search, like the standard for an investigatory stop, is an objective one based on the totality of the circumstances.   The rationale behind the protective search is to allow the officer to take reasonable precautions for his own safety in order to pursue his investigation without fear of violence."   *State v. Andrews*, 57 Ohio St.3d 86, 89, 565 N.E.2d 1271, 1274 (1991).

*State v. Millerton*, 2d Dist. Montgomery No. 26209, 2015-Ohio-34, ¶ 24-27.

{¶ 21}   The "scope of a *Terry*-type search extends to the area within the immediate control of the detainee.   * * * [S]uspects may injure police officers and others by virtue of their access to weapons, even though they may not themselves be armed." *Id.* at 1048, 103 S.Ct. at 3480."   *State v. Williams*, 51 Ohio St.3d 58, 63, 554 N.E.2d 108 (1990), citing *Michigan v. Long,* 463 U.S. 1032, 1048-1050, 103 S.Ct. 3469, 77 L.Ed.2d 1201, fn. 14 (1983). "The search must be limited to those areas in which a weapon may be placed or hidden."   *State v. Pattson*, 2d Dist. Montgomery No. 24224, 2011-Ohio-3507, ¶16.

{¶ 22} As this Court noted in *Pattson,* the "well recognized nexus between guns and drug activity, particularly where * * * the suspected drug activity involves drug trafficking and not merely use or possession of drugs, and an [officers'] fear of violence when investigating that type of activity, will justify a pat down search for weapons." (Citations omitted.)   *Pattson* at ¶ 20.   While an "officer need not testify he was actually in fear of a suspect, * * * he must articulate a set of particular facts which would lead a

reasonable person to conclude a suspect may be armed and dangerous." *State v. Holmes*, 5th Dist. Stark No. 2011CA00101, ¶ 30, citing *State v. Evans,* 67 Ohio St.3d 405, 413, 681 N.E.2d 162 (1993). " 'Nothing in *Terry* can be understood to allow a generalized cursory search for weapons, or, indeed, any search whatever for anything but weapons.' " *State v.* Calhoun, 2d Dist. Montgomery No. 13309, 1992 WL 164008 (July 16, 1992) (Grady, J., concurring separately), quoting *Ybarra v. Illinois* 444 U.S. 85, 93-94, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979); *see also United States v. Ali*, 437 Fed.Appx. 439, 444 (6th Cir. 2011) (" '* * *Terry* requires reasonable, individualized suspicion before a frisk for weapons can be conducted.' " quoting *Maryland v. Buie,* 494 U.S. 325, 334,. 110 S.Ct. 1093, 108 L.Ed.2d 276, fn. 2 (1990).). "If the protective search goes beyond what is necessary to determine if the suspect is armed, it is no longer valid under *Terry* and its fruits will be suppressed." *State v. Crusoe*, 150 Ohio App.3d 208, 2002-Ohio-6389, 779 N.E.2d 1095, ¶ 78 (2d Dist.), citing *Sibron v. New York,* 392 U.S. 40, 65-66, 88 S.Ct. 1889, 1904, 20 L.Ed.2d 917 (1968).

{¶ 23} Swallen testified that while the task force members board most buses, he was specifically aware of "a large amount of drugs coming south from Detroit." Swallen did not testify that he initially had a reasonable, articulable suspicion that criminal activity was afoot when he approached Mallory specifically, and we conclude, as did the trial court, that Swallen initiated a consensual encounter with him, as he had with the other passengers with whom he spoke. Swallen testified that he stood behind Mallory's seat, and any restriction of Mallory's movement at this point was due to "a factor independent of police conduct—*i.e.,* by his being a passenger on a bus. * * * In such a situation, the appropriate inquiry is whether a reasonable person would feel free to decline the officer['s]

requests or otherwise terminate the encounter." *Florida v. Bostick*, 501 U.S. 429, 436, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991). The evidence in this case did not establish the threatening presence of several officers, the display of a weapon, any physical touching of Mallory's person, or a suggestion that Swallen conveyed by language or tone of voice that Mallory could not terminate the encounter at the outset.

{¶ 24} The name "Williams" provided by Mallory was consistent with the name on the ticket he handed Swallen. The bus, travelling from Detroit to Nashville, would naturally pass through Kentucky, and we find Mallory's comment that he was going to Lexington to have been insufficient to create a reasonable suspicion of criminal activity.[2] Although Swallen testified that Mallory "made a noise" when asked about his name, that was of no significance as Mallory was not required to respond to Swallen at all. *See Lewis*, 2d Dist. Montgomery No. 22726, 2009-Ohio-158, at ¶ 21. In other words, we conclude that "no substantial evidence was presented by the State from which the trial court could conclude that as a result of [the officer's] training or experience the particular conduct which he observed was reasonably identifiable to him as being indicative of illegal drug activity." *State v. Brown*, 2d Dist. Montgomery No. 13958, 1993 WL 491341, *5 (Nov. 24, 1993).

{¶ 25} We further conclude, however, that as the consensual encounter progressed, it morphed into a *Terry* stop. While the trial court correctly noted that drug activity and weapons go hand-in-hand, Swallen merely testified that he was generally aware that passengers on that bus route had been known to traffic drugs. After obtaining

---

[2] There was no testimony adduced as to whether the bus route included a scheduled stop in Kentucky.

and retaining Mallory's ticket, Swallen, an imposing figure at six feet nine inches, repeatedly pushed Mallory to allow him to "check" the backpack and eventually "took control" of it. "Clearly, a bus passenger's decision to cooperate with law enforcement officers authorizes the police to conduct a search without first obtaining a warrant *only* if the cooperation is voluntary." *Bostick* at 438. The trial court determined that Mallory did not consent to the search of the backpack, and we conclude that competent credible evidence supported that finding. Swallen testified on direct examination that he asked Mallory three times to search the backpack, and Mallory testified consistently that Swallen asked three times to perform the search, and that he declined permission twice before Swallen seized it.

{¶ 26} Most significantly, it was the State's burden to establish that Swallen had reasonably feared Mallory might be armed and dangerous, and there was no evidence from which to conclude that Swallen feared violence or was concerned for his own safety or the safety of the other passengers in the course of his encounter with Mallory. Swallen did not articulate a particular set of facts, individualized to Mallory, which would have lead a reasonable person to conclude that Mallory may have been armed and dangerous. Swallen merely stated that he did not know if the backpack contained a gun, which would be true of any luggage on the bus, unless it was searched. Accordingly, we conclude that, although Swallen was interacting with Mallory at close range, the seizure of the back pack was not a reasonable precautionary measure under *Terry*. Mallory, merely by virtue of being a passenger on a bus where trafficking crimes had previously occurred, did nothing to forfeit his constitutional right to be free from unreasonable searches and seizures. Because we cannot conclude that the seizure and search of the backpack

were executed for a reasonable, protective purpose, the seizure and search were invalid.

{¶ 27} In the absence of evidence to support a reasonable suspicion that Mallory was armed and dangerous, justifying a search and seizure of his backpack, his assignment of error is sustained.

{¶ 28} The judgment of the trial court is reversed, and the matter is remanded to the trial court for further proceedings.

FROELICH, J., concurs.

WELBAUM, J., dissents:

{¶ 29} I very respectfully dissent.

{¶ 30} I believe the trial court's judgment should be affirmed for the reasons it stated in its order finding that a *Terry* search was valid under the totality of the circumstances in this case.

{¶ 31} In its introductory paragraph, the trial court expressed its credibility findings in two footnotes:

FN 1: (Officer Swallen) Whose testimony the Court finds credible in every material respect.

FN 2: The Court does not find Mr. Mallory credible in every material respect. On the contrary, insofar as Mr. Mallory's testimony is at odds with Ofc. Swallen's testimony, the Court finds credible Ofc. Swallen's testimony to be the accurate recitation of the facts herein.

Order Denying Motion to Suppress, p. 1, fn.1 and 2.

{¶ 32} Because the trial court specifically found that Officer Swallen was "credible in every material respect" and did not find Mallory's version of the events credible, no conflict of evidence existed concerning what happened. As indicated by the majority opinion, we defer to the trial court's factual findings, but independently determine whether the court properly applied the substantive law to the facts of the case. All facts determined by the trial court supported a valid *Terry* search.

{¶ 33} Specifically, the trial court found that when Officer Swallen entered the bus, he was investigating a known pipeline between Detroit and Nashville involving illegal transportation of drugs, weapons, money, and humans. Notably, Swallen was an experienced detective who had conducted hundreds of prior pill arrests.

{¶ 34} The trial court further found that:

> * * * As the result of this brief encounter with Mr. Mallory, Ofc. Swallen had learned that Mr. Mallory was unable to give his complete name and was traveling on a Nashville ticket yet told Ofc. Swallen he was traveling to Kentucky. Taking into account the totality of the circumstances including Mr. Mallory's suspicious behavior, Ofc. Swallen was righteous in continuing his investigation and pursuant to *Terry* he had every right to ensure the absence of any weapons in Mr. Mallory's backpack. * * *

Order Denying Motion to Suppress at p. 4.

{¶ 35} After reviewing the testimony, I find that it supports the trial court findings. When Swallen approached Mallory, he asked for Mallory's name and his ticket. Mallory gave his name as "Williams," and also gave Swallen a ticket bearing the name "Justin Williams" for the trip from Detroit to the destination of Nashville, Tennessee. When

Swallen asked Mallory his first name again, Mallory "wasn't able to give it to me. He just kind of made a noise." Suppression Tr. p. 10-11. Furthermore, when Swallen asked Mallory his first name again, Mallory "just kind of stared" at Swallen. *Id.* at p. 21.

{¶ 36} In addition, Swallen testified that:

I asked him where he was heading. He told me he was going down to Lexington to see his family. I asked him, where about in Lexington? He didn't give me [an answer]. I pointed out that his ticket said Nashville.

At that point, I asked him if he had any bags. He told me he had one bag. I asked if we could check it. It was at the seat. He grabbed it off the floor and put it up. He opened the bag, started looking through it. I again asked if I could look through it, and he was just kind of just showing me clothes and stuff. I asked again and he said yes, and that is when I found a sock containing the pills.

Suppression Tr. at p. 11.

{¶ 37} Swallen's testimony then continued in more detail, as follows:

Q [PROSECUTOR]: And he picked it [the bag] up and set it on his lap?

A: Set in on, I believe the seat next to him.

Q: Okay. So it was an empty seat next to him?

A: Yeah.

Q: And is this like a duffel bag, zipper, do you recall?

A: A backpack.

Q: Backpack. Okay. Do you then – he opens it himself?

A: Yes.

Q:      It was not at your direction?

A:      No.

Q:      Okay.   And at what point do – or does he hand the bag over to you?

A:      After I asked him a couple of times if I could look through [it], because he was like showing me what was in it.

Q:      And why did you ask him to hand it over to you versus letting him do it himself?

A:      I don't know if there's guns.   I don't know what's in the bag.

Q:      And did you convey that to him –

A:      Yes.

Q:      About your concern?

A:      I did.

Q:      And did he hand you the bag, or did you take it from him?

A:      It was there on the seat still.

Q:      Okay.

A:      I took control of it, yes.

Suppression Tr. at p. 12-13.

{¶ 38} Accordingly, as determined by the trial court, Swallen's testimony indicated that he was concerned about a gun in the backpack and communicated that to Mallory.

{¶ 39} I further disagree with the importance the majority places on the lack of testimony about whether the bus route included a scheduled stop in Kentucky.   Even in the absence of such testimony, suspicion was warranted here under the totality of the circumstances.    Specifically, why would a person who apparently did not know his first

name purchase a bus ticket to go all the way to Nashville, Tennessee, if his intent were to visit family in Lexington, Kentucky? Adding to the weight of the suspicion was Mallory's failure to respond to Swallen's question about where Mallory's family lived in Lexington.

{¶ 40} I also disagree with the majority's conclusion that a *Terry* analysis may not consider a defendant's nonresponsiveness to inquiries about his first name. In contrast to the majority's position, I believe four nonresponses were at issue. First, when Swallen asked Mallory his name, Mallory gave only a fake last name. Second, after being asked specifically what his first name was, Mallory answered only by making a "noise." Suppression Tr. at p. 10-11. Third, Swallen then asked Mallory his first name again, but he "just kind of stared" at Swallen. *Id.* at p. 21. And finally, Mallory also failed to respond when asked about the part of Lexington in which his family lived. *Id.* at p. 11. These four nonresponses may be considered in combination with the other facts under the authority of both the United States Supreme Court and the Supreme Court of Ohio.

{¶ 41} The police can initiate contact with a person without having an objective level of suspicion, during which time the police may ask questions of the person, ask for identification, and request permission to search baggage that the individual may have in his or her possession. That individual, however, has a right to ignore the police and "go on his way." *Florida v. Royer,* 460 U.S. 491, 498, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983). Moreover, pertinent to the issue presented here, an individual's "refusal to cooperate, *without more,* does not furnish the *minimal level of objective justification* needed for detention and seizure." (Emphasis added.) *Bostick,* 501 U.S. 429, 437, 111 S.Ct. 2382, 115 L.Ed.2d 389. *See also State v. Robinette,* 80 Ohio St.3d. 234, 240, 685 N.E.2d 762

(1997), citing *Royer* at 497-498 (A person "may not be detained even momentarily without reasonable, objective grounds for doing so; and his refusal to listen or answer does not, *without more*, furnish those grounds." (Emphasis added.)) In the case before us, however, there was "more."

{¶ 42} The majority opinion notes that Mallory testified consistently that Swallen asked three times to perform the search, and that he declined permission twice before Swallen seized the bag. However, as explained earlier, the trial court found that Mallory's testimony was not credible. We therefore are not free to consider this testimony.

{¶ 43} Although the majority suggests a plausible explanation for the inconsistency between the ticket destination and Mallory's representations, this explanation must be viewed in context. Parsed out layer by layer, a plausible, innocent explanation was conceivable for each inconsistency, omission, and action of Mallory. However, in totality, under the unique circumstances of this case, there was sufficient evidence to justify a *Terry* search.

{¶ 44} In *U.S. v. Black,* 675 F.2d 129 (7th Cir.1982), the court commented that:

We are unmoved by the defendant's assertion that all of his actions and responses were consistent with wholly innocent behavior, and could not therefore give rise to reasonable suspicion without subjecting every airport passenger to potential police seizure. As other courts confronted with similar situations have noted, "[i]t must be rare indeed that an officer observes behavior consistent only with guilt and incapable of innocent interpretation." *United States v. Price*, 599 F.2d 494, 502 (2nd Cir.1979)

* * * It is for that reason that the applicable standard in determining the propriety of a *Terry* stop is not whether the defendant's acts can be construed as innocent through the exercise of exegetical speculation, but rather whether they give rise to an articulable, reasonable suspicion of criminal activity.

(Citation omitted.) *Id.* at 137.

{¶ 45} Finally, I find it noteworthy that Mallory's actions increased the potential danger to Swallen and other passengers. When Mallory decided to open the backpack and began taking out items in the close confines of the bus, it created an exigency that increased the justification for the *Terry* search. Notably, Swallen expressed his concern to Mallory that he needed to take control of the bag at that point because he "did not know if there were guns or what is in the bag." Suppression Tr. at p. 13

{¶ 46} In view of the preceding discussion, I believe the unique facts of this case supported the conclusion that Detective Swallen was justified in conducting a *Terry* search of Mallory's backpack. Therefore, I would affirm the decision of the trial court.

Copies sent to:

Mathias H. Heck, Jr.
Jamie J. Rizzo
Jeffrey R. McQuiston
Hon. Steven K. Dankof