[Cite as *State v. Watkins*, 2021-Ohio-1443.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
WOOD COUNTY

State of Ohio/City of Bowling Green      Court of Appeals No. WD-20-054

    Appellee      Trial Court No. 20TRC01221

v.

Charaya S. Watkins      **DECISION AND JUDGMENT**

    Appellant      Decided: April 23, 2021

* * * * *

Hunter Brown, City of Bowling Green Prosecutor, for appellee.

Michael B. Kelley, for appellant.

* * * * *

**MAYLE, J.**

{¶ 1} Defendant-appellant, Charaya S. Watkins, appeals the July 27, 2020 judgment of the Bowling Green Municipal Court, convicting her of operating a vehicle while under the influence of alcohol or drugs. For the following reasons, we reverse the trial court judgment.

## I. Background

{¶ 2} On February 23, 2020, Charaya Watkins drove to the State Highway Patrol Post in Bowling Green, Ohio to pick up, M.S., a friend who had been arrested for operating a vehicle while under the influence of alcohol ("OVI"). Shortly after arriving, Watkins herself was arrested for OVI, a violation of R.C. 4511.19(A)(1)(a) and (d).

{¶ 3} On June 11, 2020, Watkins filed a motion to suppress the results of field sobriety and breath-alcohol-concentration ("BAC") tests leading to her arrest, claiming that the officer lacked the reasonable, articulable suspicion necessary to warrant detaining her and administering the tests. The trial court held a suppression hearing on June 22, 2020. State Highway Patrol Trooper Christopher Kiefer and Watkins's boyfriend, C.M., testified.

{¶ 4} Trooper Kiefer testified that on the evening of February 22, 2020, while working the 10:00 p.m. to 6:00 a.m. shift, he pulled over a vehicle and ultimately arrested M.S. for OVI. Watkins arrived at the scene of that arrest in a separate vehicle and asked what was going on. Trooper Kiefer said that M.S. was being arrested and told Watkins that she could pick him up at the patrol post. Watkins remained approximately 20 to 30 yards away during this interaction.

{¶ 5} One to two hours later, Watkins walked into the patrol post to pick up M.S. Trooper Kiefer made eye contact with her and noticed that her eyes were bloodshot and glassy. He detected the odor of alcohol emanating from her breath. He asked if she had been drinking and she said that she consumed one alcoholic beverage at 6:30 p.m.

2.

{¶ 6} Trooper Kiefer asked Watkins to take a portable breath test ("PBT"). She submitted to the test, and it detected a blood alcohol content ("BAC") of 0.117. He then took her out to where his patrol car was parked and directed her to stand in front of the vehicle, in view of the dashboard camera. He asked her to perform field sobriety tests, including the horizontal gaze nystagmus ("HGN") test, the walk-and-turn, and the one-leg stand, and he asked Watkins to recite C through X of the alphabet without singing it.

{¶ 7} Watkins exhibited six out of six clues on the HGN, four on the walk-and-turn, and two on the one-leg stand. With respect to the alphabet test, Watkins began by saying "C, D," then started over, successfully reciting C through X. Kiefer read Watkins the BMV Form 2255, then asked her to submit to a breath test. The breath test revealed a BAC of 0.114.

{¶ 8} On cross-examination, Trooper Kiefer agreed that there can be other causes for bloodshot, glassy eyes besides alcohol consumption, such as crying and eye fatigue. He could not recall whether the odor of alcohol he observed was slight or moderate or what type of alcohol it was. He did not recall Watkins stumbling or slurring her speech.

{¶ 9} Trooper Kiefer confirmed that it is not protocol to ask a person to take field sobriety or breath tests as a matter of course when picking up someone who has been arrested for OVI. However, because Watkins was going to be responsible for transporting M.S., and because he observed indicators of possible impairment, he followed up and asked Watkins to take the PBT.

3.

{¶ 10} C.M. testified that his birthday was on February 23, and he and a group of people were "pre-gaming" on February 22, before his birthday party. His cousin, M.S., called to tell him he had been pulled over. C.M. drove to the location of the traffic stop around 12:10 a.m. on February 23. Trooper Kiefer instructed him to get back in his car. He did, and then left the scene.

{¶ 11} M.S. called C.M. around 2:30 or 3:00 a.m. and said that if a licensed driver did not come to pick him up immediately, he would be taken to jail. Watkins, C.M., and two other women drove to the post to get M.S. C.M. had been drinking, but Watkins had not because she was the designated driver. She went in to get M.S. Thirty minutes passed without her coming out, so C.M. went in to check on her. Trooper Kiefer told him that she would not be able to leave because she "blew twice over the legal limit."

{¶ 12} C.M. testified that the other two women who went with him to the station were subjected to similar questioning and testing as Watkins. One of the women had a BAC of zero and was permitted to drive everyone home. C.M. testified that he did not see Watkins consume any alcohol that night. He also testified that she had cried that evening, possibly explaining her bloodshot, glassy eyes.

{¶ 13} Immediately following the suppression hearing, the trial court denied Watkins's motion to suppress. The court reasoned that the hour of the night, Watkins's admission that she had consumed alcohol, the odor of alcohol, bloodshot, glassy eyes, and the results of the PBT of 0.117 provided reasonable, articulable suspicion for Trooper

4.

Kiefer to request field sobriety tests, and the results of those tests, in conjunction with Trooper Kiefer's observations, provided probable cause to arrest Watkins.

{¶ 14} Watkins entered a plea of no contest to the OVI charge. The court made a finding of guilty and sentenced her to a fine of $1,075 ($475 suspended), a 33-day jail term (30 days of which were suspended and the other three to be served in a driver intervention program), a one-year license suspension, and three years' community control. Watkins's conviction and sentence were memorialized in a judgment journalized on July 20, 2020.

{¶ 15} Watkins appealed. She assigns the following error for our review:

The trial court erred when it denied Appellant's motion to suppress because the facts do not show reasonable articulable suspicion to detain Appellant and request field sobriety tests, and no probable cause existed to arrest Appellant.

## II. Law and Analysis

{¶ 16} In her sole assignment of error, Watkins argues that the trial court erred when it denied her motion to suppress the results of the field sobriety and breath tests that were performed. She maintains that the odor of alcoholic beverages, glassy, bloodshot eyes, and her admission to drinking one alcoholic beverage seven hours earlier did not supply Trooper Kiefer with reasonable, articulable suspicion to detain her to request those tests.

5.

{¶ 17} The state responds that several of the factors enumerated by the court in *State v. Evans*, 127 Ohio App.3d 56, 63, 711 N.E.2d 761 (11th Dist.1998), were indicated here, supplying Trooper Kiefer with reasonable, articulable suspicion to conduct field sobriety tests. Those indicators included (1) the time of the "stop" (3:12 a.m.); (2) the odor of alcohol; (3) bloodshot, glassy eyes; (4) Watkins's admission that she had been drinking; (5) the fact that Watkins had been at the same party as M.S.; and (5) the results of her PBT.

{¶ 18} "Appellate review of a motion to suppress presents a mixed question of law and fact." *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8. When the trial court considers a motion to suppress, it acts as the factfinder and is in the best position to resolve factual questions and to evaluate the credibility of witnesses. *Id.* We, therefore, must accept the trial court's findings of fact if they are supported by competent, credible evidence. *Id.* Our role then is to independently determine, without deference to the trial court's conclusion, whether the facts satisfy the applicable legal standard. *Id.*

**A. Trooper Kiefer's initial encounter with Watkins was consensual.**

{¶ 19} The Fourth Amendment to the United States Constitution and Article I, Section 14 of the Ohio Constitution protect citizens from unreasonable searches and seizures. "'The U.S. Supreme Court has created three categories of police-citizen contact to identify the separate situations where constitutional guarantees are implicated: (1) consensual encounters, (2) investigative or "*Terry* [*v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868,

20 L.Ed.2d 889 (1968)]" stops, and (3) arrests.'" (Citations omitted.) *State v. Williams*, 6th Dist. Lucas No. L-17-1148, 2018-Ohio-5202, ¶ 20, quoting *State v. Staten*, 4th Dist. Athens No. 03CA1, 2003-Ohio-4592, ¶ 16.

{¶ 20} An arrest requires probable cause. *State v. Barner*, 6th Dist. Wood No. WD-01-034, 2002-Ohio-2044. "Probable cause exists when circumstances would warrant a prudent person to believe that a suspect has committed an offense." *Id.*

{¶ 21} An investigatory stop requires reasonable, articulable suspicion of criminal activity. *State v. Mesley*, 134 Ohio App.3d 833, 840, 732 N.E.2d 477 (6th Dist.1999), citing *United States v. Brignoni-Ponce*, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975). It constitutes a seizure for purposes of the Fourth Amendment. *State v. Westover*, 2014-Ohio-1959, 10 N.E.3d 211, ¶ 16 (10th Dist.).

{¶ 22} A consensual encounter requires neither probable cause nor reasonable, articulable suspicion of criminal activity. *Staten* at ¶ 17. An encounter may be said to be consensual when police "approach an individual in a public place, engage the person in conversation, and request information, as long as the person is free to walk away." *Id.* An officer may ask to examine a person's identification or search his or her belongings during a consensual encounter and he need not inform the citizen that he or she may decline the request and walk away. *Id.* When a consensual encounter turns into an investigative detention, however, constitutional protections are implicated and the officer must have reasonable suspicion for the detention. *State v. Martin*, 2018-Ohio-1705, 111 N.E.3d 730, ¶ 9 (9th Dist.).

7.

{¶ 23} Here, Watkins's encounter with Trooper Kiefer began when she voluntarily entered the patrol post to pick up M.S. In *State v. Murray*, 6th Dist. Wood No. WD-18-045, 2019-Ohio-4285, under circumstances substantially similar to the present case, we found that the defendant's initial encounter with the trooper was consensual where the defendant voluntarily entered the police station to pick up his friend who had been arrested for OVI. *See also State v. Trevarthen*, 11th Dist. Lake No. 2010-L-046, 2011-Ohio-1013, ¶ 19 (finding encounter consensual where defendant drove to the police station to pick up his friend who had been arrested for OVI and parked behind trooper's police cruiser); *State v. Trimble*, 11th Dist. Portage No. 2010-P-0078, 2011-Ohio-4473 (finding encounter consensual where trooper approached defendant's vehicle when he arrived at police station to pick up friend who had been arrested for OVI).

{¶ 24} Having concluded that Watkins's initial encounter with Trooper Kiefer was consensual, we must next determine whether, during that consensual encounter, Trooper Kiefer developed reasonable, articulable suspicion that Watkins had driven to the patrol post while intoxicated, so as to justify the investigative detention, PBT, and field sobriety tests that followed.

## B. Reasonable, articulable suspicion did not arise during the consensual encounter.

{¶ 25} While a consensual encounter requires no probable cause or reasonable, articulable suspicion, "[a] request that a driver perform field sobriety tests 'must be separately justified by specific, articulable facts showing a reasonable basis for the request.'" *Trevarthen* at ¶ 15, quoting *Evans*, 127 Ohio App.3d at 62, 711 N.E.2d 761,

8.

citing *State v. Yemma*, 11th Dist. No. 95-P-0156, 1996 WL 495076 (Aug. 9, 1996). "Whether a request to perform field sobriety tests was reasonable is to be considered under the totality of the circumstances." *Trevarthen* at *id.*, citing *Evans* at 63.

{¶ 26} It is often a close issue whether the specific facts of a case provide an officer with reasonable, articulable suspicion for conducting field sobriety tests. *State v. Beeley*, 6th Dist. Lucas No. L-05-1386, 2006-Ohio-4799, ¶ 16. Such decisions are "very fact-intensive." *State v. Burkhart*, 2016-Ohio-7534, 64 N.E.3d 1004, ¶ 15 (4th Dist.). Ohio courts often reach differing conclusions when faced with seemingly similar circumstances. Numerous factors may be considered, and small differences between officers' descriptions of an encounter can form the basis for opposite outcomes.

{¶ 27} In *Evans*, the Eleventh District compiled a list of the factors that Ohio courts have considered in determining whether an officer acted reasonably in detaining a person to investigate suspicions that he or she operated a vehicle while intoxicated. Those factors include:

> (1) the time and day of the stop (Friday or Saturday night as opposed to, *e.g.,* Tuesday morning); (2) the location of the stop (whether near establishments selling alcohol); (3) any indicia of erratic driving before the stop that may indicate a lack of coordination (speeding, weaving, unusual braking, etc.); (4) whether there is a cognizable report that the driver may be intoxicated; (5) the condition of the suspect's eyes (bloodshot, glassy, glazed, etc.); (6) impairments of the suspect's ability to speak (slurred

9.

speech, overly deliberate speech, etc.); (7) the odor of alcohol coming from the interior of the car, or, more significantly, on the suspect's person or breath; (8) the intensity of that odor, as described by the officer ("very strong," "strong," "moderate," "slight," etc.); (9) the suspect's demeanor (belligerent, uncooperative, etc.); (10) any actions by the suspect after the stop that might indicate a lack of coordination (dropping keys, falling over, fumbling for a wallet, etc.); and (11) the suspect's admission of alcohol consumption, the number of drinks had, and the amount of time in which they were consumed, if given.

*Id.* at fn. 2. As emphasized by the *Evans* court, "[n]o single factor is determinative." *Id.*

{¶ 28} This court has considered many of these factors in determining whether reasonable, articulable suspicion exists to warrant administration of field sobriety or breath tests. Sometimes those factors weigh in favor of a finding of reasonable, articulable suspicion.

{¶ 29} For instance, in *Beeley*, 6th Dist. Lucas No. L-05-1386, 2006-Ohio-4799, Beeley was stopped at 3:00 a.m. for driving seven m.p.h. over the speed limit. He was not weaving or driving erratically, but when the trooper approached the vehicle to speak to Beeley, he detected a "strong" odor of alcohol. Beeley admitted to the trooper that he had been drinking an hour before, however, his speech was not slurred and his gait was not unsteady. We found that the strong odor of alcohol, combined with Beeley's

admission to drinking, provided reasonable, articulable suspicion to conduct field sobriety tests.

{¶ 30} Similarly, in *New London v. Gregg*, 6th Dist. Huron No. H-06-030, 2007-Ohio-4611, ¶ 19, Gregg was stopped at 3:15 a.m. for suspicion of failure to properly display license plates, at which time the officer also noticed that Gregg was not wearing a seat belt. During the stop, the officer perceived that Gregg's eyes were "red" and "glassy," he smelled a "mild" to "moderate" odor of alcohol emanating from inside the vehicle, and Gregg admitted to having a few beers. While the officer was not able to say whether the odor of alcohol was coming from the passenger, the vehicle, or from Gregg, and even though Gregg's speech was not slurred and his driving was not impaired, we concluded that the officer had formed reasonable, articulable suspicion to perform field sobriety tests. We acknowledged that "these facts present a close question," but we held that "[w]here a non-investigatory stop is initiated and the odor of alcohol is combined with glassy or bloodshot eyes and further indicia of intoxication, such as an admission of having consumed alcohol, reasonable suspicion exists." (Internal citations and quotations omitted.) *Id.* at ¶ 17, 19.

{¶ 31} And in *State v. Maddux*, 6th Dist. Wood No. WD-08-065, 2010-Ohio-941, the officer initiated a stop of Maddux's vehicle at 2:57 a.m. because her license plate light was not illuminated. When asked for her operator's license, Maddux searched her entire purse looking for it, only to find that it was in her coat pocket. While Maddux searched for her license, the officer detected an odor of alcohol and saw that her eyes

11.

were glassy, and Maddux admitted that she had consumed two alcoholic beverages. We found that under the totality of the circumstances, reasonable suspicion of criminal activity arose sufficient to justify detaining Maddux for field sobriety and breath tests, therefore, the trial court properly denied Maddux's motion to suppress the results of those tests.

{¶ 32} Despite our conclusions in *Beeley, Gregg,* and *Maddux,* similar—but not identical—facts have led us to reverse trial courts' decisions denying defendants' motions to suppress.

{¶ 33} For example, in *State v. Kennard*, 6th Dist. Huron No. H-01-006, 2001 WL 605106, *1-2 (June 1, 2001), Kennard caught the trooper's attention around 2:00 a.m. because her vehicle lacked a functioning license plate light. He then saw Kennard weave within her own lane of travel. He initiated a stop of the vehicle. According to the trooper, Kennard's speech was slurred and he detected a moderate or strong odor of alcohol about her person. She admitted to drinking one beer. The trooper administered field sobriety tests and conducted a PBT. Kennard moved to suppress the results of those tests. The trial court granted Kennard's motion. It found that the trooper lacked a factual basis for requiring Kennard to submit to either field sobriety tests or to a breath-alcohol test. Important to its decision was that based on its review of the video recording of the stop, Kennard's speech was *not* slurred, calling into question the trooper's credibility.

12.

{¶ 34} The state appealed, but we agreed with the trial court. Ignoring the slurred speech, we held that the remaining factors—the time of the stop, the moderate to strong odor of alcohol about her person, and Kennard's admission to drinking one beer—were insufficient to give rise to a reasonable, articulable suspicion that Kennard was intoxicated.

{¶ 35} Likewise, in *State v. Stricklin*, 6th Dist. Lucas L-10-1277, 2012-Ohio-1877, an officer initiated a stop of Stricklin's vehicle at 1:26 a.m., after observing that one of his headlights was inoperable. Stricklin struck the headlight with his hand, rendering it operable, but during the course of their interaction, the officer noticed that Stricklin had a slight odor of alcohol on his breath, bloodshot, glassy eyes, and an anxious demeanor. Stricklin denied that he had been drinking. The officer ran Stricklin's license information and learned that he had a prior OVI. He asked Stricklin to take a PBT, which Stricklin refused, then asked him to exit the vehicle to administer field sobriety tests. After determining that Stricklin failed those tests, the officer arrested him for OVI.

{¶ 36} On appeal from the trial court's decision denying his motion to suppress the results of the field sobriety tests, we explained that "[t]raffic violations of a de minimus [sic] nature, combined with a slight odor of an alcoholic beverage, and an admission of having consumed a 'couple' beers, are not sufficient to support a reasonable and articulable suspicion of DUI." *Id.* at ¶ 12. We held, therefore, that the officer's observations did not provide reasonable, articulable suspicion to warrant the administration of field sobriety tests, and we reversed the trial court decision.

13.

{¶ 37} Here, Watkins did not stumble or slur her words or show other signs of impairment. Trooper Kiefer observed only that her eyes were bloodshot and glassy (at approximately 3:00 a.m.), she smelled of alcohol (of an unspecified strength), and she admitted to having had one glass of wine (approximately seven hours earlier). As we have often recognized, this case presents a close issue. We must conclude, however, based on *Kennard*, 6th Dist. Huron No. H-01-006, 2001 WL 605106 and *Stricklin*, that these observations did not provide Trooper Kiefer with reasonable, articulable suspicion to warrant administering field sobriety and breath tests.

{¶ 38} Accordingly, we find Watkins's sole assignment of error well-taken.

### III. Conclusion

{¶ 39} Reasonable, articulable suspicion did not arise warranting the administration of field sobriety and breath tests during Watkins's consensual encounter with Trooper Kiefer. Specifically, Trooper Kiefer observed the odor of alcohol emanating from Watkins, but of an unspecified strength, her eyes were bloodshot and glassy, but it was the middle of the night, and she admitted to consuming one alcoholic beverage many hours earlier. The trooper observed no other signs of impairment. We find Watkins's single assignment of error well-taken.

{¶ 40} We reverse the July 27, 2020 judgment of the Bowling Green Municipal Court and remand for further proceedings. The city is ordered to pay the costs of this appeal under App.R. 24.

Judgment reversed
and remanded.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Mark L. Pietrykowski, J.          _____
                                                      JUDGE

Christine E. Mayle, J.          

Myron C. Duhart, J.             _____
CONCUR.                                              JUDGE


                                _____
                                                      JUDGE


This decision is subject to further editing by the Supreme Court of
Ohio's Reporter of Decisions.  Parties interested in viewing the final reported
version are advised to visit the Ohio Supreme Court's web site at:
http://www.supremecourt.ohio.gov/ROD/docs/.