[Cite as *State v. Haskins*, 2026-Ohio-19.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

State of Ohio

    Appellee

v.

Gerald Haskins

    Appellant

Court of Appeals No. {48}L-24-1248

Trial Court No. CR0202302529

**DECISION AND JUDGMENT**

Decided: January 6, 2026

* * * * *

Julia R. Bates, Prosecuting Attorney, and
Evy M. Jarrett, Assistant Prosecuting Attorney, for appellee.

Katherine Ross-Kinzie, for appellant.

* * * * *

**DUHART, J.**

{¶ 1} Following a court trial, defendant-appellant, Gerald Haskins, appeals the June 21, 2024 judgment of the Lucas County Court of Common Pleas convicting him of aggravated robbery and sentencing him to an aggregate prison term of 15 to 18 years. For the following reasons, we affirm in part, reverse in part, and remand this matter for resentencing.

**I. Background and Facts**

{¶ 2} Haskins was indicted on three counts of aggravated robbery in violation of R.C. 2911.01(A)(1), all first-degree felonies. Each charge included a three-year firearm

specification under R.C. 2941.145(A).  The charges arose from the robbery of the Circle K gas station on Clayton Street in Toledo.

## A. Suppression

{¶ 3} Before trial, Haskins filed a motion to suppress the evidence police seized from his backpack at the time of his arrest because his encounter with the police was not consensual and the officers did not have the reasonable, articulable suspicion necessary to detain him.

{¶ 4} At the suppression hearing, the State called Toledo Police Department officers Kirk Haeuptle and Robert Ebright Jr.

{¶ 5} Haeuptle testified that he was on patrol the night of September 1, 2023, when he and his partner, Ebright, received a call around 11:45 p.m. to respond to the Circle K gas station on Clayton Street in Toledo for a robbery in progress.  After responding to the gas station, they searched the area for the suspect based on the description given by the victims.  During their search, they came across Haskins at the end of the High Level Bridge across the river from where the Circle K was located, which was less than one mile from the Circle K.  The officers found Haskins around 12:05 a.m., about 20 minutes after being dispatched to the robbery.

{¶ 6} Haeuptle said that the officers began their encounter with Haskins by getting out of their car, approaching him, and asking him questions.  When the officers began talking to Haskins, he put a backpack that he had with him on the ground.  The officers asked him where he was coming from, his name, and if they could look in his backpack.  Haskins said they could look in the backpack.  Officers found a "blue shirt or hoody,"

2.

blue pants with a white stripe, black shoes, money, a hat, and a wallet that had someone else's identification card in it. According to Haeuptle, the clothing in the backpack matched the description of the clothing the robbery suspect was wearing. Haskins said the clothes were for his job as a painter and the money was from being paid under the table. Haeuptle did not see any paint on the items in the backpack.

{¶ 7} Until the officers found out that Haskins had a warrant out for his arrest, they did not place him under arrest or put handcuffs on him, they did not tell him that he was not free to leave, and Haeuptle did not draw his gun during the encounter.

{¶ 8} The State played video from Haeuptle's body camera during the hearing. In it, Haeuptle says to Haskins, "hey man, do me a favor and come on over here for a second" as he's walking toward Haskins. Haskins, who is wearing blue jeans, a light gray or white sweatshirt, and white shoes, complies with the officer's request, puts his backpack on the ground, and puts his hands in the air. Haeuptle next asks where Haskins is coming from; Haskins responds, "I'm coming from work." The conversation continues with Haeuptle asking where Haskins works. Haskins gives the name of the company and volunteers that he is a painter. As Haeuptle is talking to Haskins, Ebright approaches Haskins from the other side, stands beside him, and asks if he has anything in his pockets. Haskins tells him what is in his pockets and mentions that he has money in his backpack. When Ebright asks if he has an ID, Haskins explains that he does not because he lost it and his wallet. Ebright next asks Haskins to "do [him] a favor, step over here up to the front of [his] car for [him], all right?" Haskins complies, and Ebright walks behind him. When Haskins reaches the police cruiser, he leans on the hood, and Ebright stands behind

3.

him. After that, as Haeuptle begins searching the backpack, Ebright is out of the camera's frame.

{¶ 9} As Haskins reaches the police car and leans on its hood, Haeuptle picks up his backpack and says, "do you care if I look?" Haskins responds, "No." Ebright is walking behind Haskins when Haeuptle asks to search the backpack. While Haeuptle is looking through the backpack, Haskins tells him that he is looking at work clothes, money from getting paid under the table, his gloves, his flashlight, and his "other shit." Meanwhile, Ebright asks dispatch if there is any additional description of the robbery suspect, such as the color of his shoes or whether he had a white stripe on his jumpsuit. He does not relay any additional information to Haeuptle.

{¶ 10} At some point while Haeuptle is looking through the backpack, a third police officer joins Ebright in standing behind Haskins, who is still leaning on the hood of the cruiser. Haskins gives the third officer his identifying information while Ebright is standing behind him and Haeuptle is searching the backpack. As Haeuptle finishes his search of the backpack, Haskins asks, "What happened? Why am I being stopped or whatever?" Haeuptle tells him that it "will all be explained in time." Toward the end of the video, officers arrest Haskins on an outstanding warrant. By this time, a fourth person had arrived on the scene and was videotaping the encounter. The entire encounter lasted about six minutes.

{¶ 11} On cross-examination, Haeuptle said that the bridge was not closed to pedestrian traffic that night. The description of the robbery suspect was "a black male

4.

wearing an all blue jumpsuit or all blue top and bottom and black shoes[,]" and Haskins did not match the description.

{¶ 12} Haeuptle admitted that saying "come on over here for a second" was not a question. Haeuptle and Ebright were standing on either side of Haskins while they were talking to him, and a third officer joined them during the conversation.

{¶ 13} Ebright testified that he and his partner, Haeuptle, were on patrol the night of September 21, 2023, when they received a call for a robbery in progress. He did not remember what time the call came in but recalled that "no more than a half hour" passed between the time they received the dispatch and the time they stopped Haskins.

{¶ 14} After responding to the Circle K, the officers began driving around the area because they were told that the suspect had fled on foot. As they were driving, they saw a man walking on the High Level Bridge, about one-half mile from the Circle K. It was "[n]ot too common" to see pedestrians on the bridge at that time of night. They waited for the man on the far side of the bridge "[a]t which time [they] exited [their] patrol vehicle and asked him if [they] could speak with him." He recalled Haeuptle asking if they could speak with Haskins, "if there was anything in the bag[,]" and "if he mind[ed] if he would check." Haskins was not seized or detained during this initial interaction, Ebright did not tell Haskins that he was not free to leave, and there was no way to block Haskins's progress if he chose to continue walking.

{¶ 15} When Haeuptle searched Haskins's bag, he found "[s]ome clothes, a hat, lots of loose cash, multiple denominations, and a wallet type object." Ebright found the

5.

amount of loose cash "odd." There was an ID in the wallet that was not Haskins's. Haskins was arrested at the end of the stop because of an outstanding warrant.

{¶ 16} On cross, Ebright recalled that the robber was described as wearing a blue jumpsuit, and Haskins was wearing a white hoodie and blue jeans when they stopped him. Although Haskins's clothes did not match the robber's description, his physical characteristics did. However, Ebright could not remember the descriptions the witnesses provided.

{¶ 17} Ebright remembered that he was standing on one side of Haskins and Haeuptle was standing on the other side of him. He said that if both officers approached Haskins from the front, "then he would feel like it was mandatory for him to stop."

{¶ 18} After taking the matter under advisement, the trial court denied Haskins's motion to suppress. It found that Haeuptle and Ebright's initial encounter with Haskins was a consensual encounter because Haeuptle's request that Haskins "do [him] a favor and come on over here for a second" was not a command, and Haskins could have ignored it. The court went on to find that the encounter morphed into a *Terry* stop almost immediately because the officers patted Haskins down, asked him what he had on him and whether he had ID, stood close to him on either side, which limited his movement and blocked his path to the sidewalk, and stood behind him while he was at the hood of the police car. Additionally, while the officers detained him, Haeuptle was looking at the clothes and shoes that Haskins had in his backpack while Ebright asked dispatch for more information about the descriptions of the clothes and shoes worn by the robbery suspect. The court also determined that the officers had reasonable, articulable suspicion to stop

6.

and investigate Haskins. They were responding to a dispatch for an aggravated robbery that included the use of a gun; they found Haskins about 20 minutes after the call, walking away from the scene of the robbery, and less than a mile away; and Ebright testified that Haskins met the physical descriptions of the robbery suspect, despite not wearing the same clothing. The court concluded, "[a]lthough not described in detail, the Court finds that the officers were trustworthy in their statements as to why they wanted to stop and talk to [Haskins]." It also found that the officers were justified in patting Haskins down because of the nature of the crime they were investigating and the time of night.

{¶ 19} Next, the court found that Haskins voluntarily consented to the search of his backpack. Despite finding that the officers were conducting a *Terry* stop, the trial court found that Haskins's "detention status was voluntary at the time that the consent to search the backpack was given" based on Haskins's failure to resist being questioned and being asked to move, offering more information than the officers asked for, lack of coercive police procedures, and Haskins's cooperative and polite attitude.

{¶ 20} Finally, the trial court found that, even if Haskins did not voluntarily consent to the search of his backpack, its contents inevitably would have been discovered when it was searched incident to Haskins's arrest on his outstanding warrant.

**B. Trial**

{¶ 21} Haskins's case was tried to the court. The State called TPD lieutenant Philip Cook; officers Michael Rickard, Terrell Batson, Kirk Haeuptle, and Robert Ebright; and detective Sherri Wise.

7.

{¶ 22} Cook testified that he is responsible for retrieving 911 calls and call records. He presented the records of the three 911 calls related to the Circle K robbery on September 21, 2023. The incident detail report that accompanied the 911 calls showed that Haeuptle and Ebright arrived on the scene at Circle K at 11:53 p.m.

{¶ 23} In one call, the caller reports that the Circle K was being robbed at gunpoint by a black male, about six feet tall, wearing a blue hoodie and black mask. He did not see a vehicle that the man might have come in.

{¶ 24} In another call, the caller reported that the robber was a black man with a gun wearing an all-blue suit and a mask. He put another employee on the phone, who was unable to tell the operator which way the suspect went.

{¶ 25} In the final call, the caller reported that the robber was a "thin black guy" who had a gun and was wearing all blue with a blue hoodie, blue jeans, and a mask covering the bottom half of his face.

{¶ 26} Rickard testified that he was on duty the night of the robbery. He recalled dispatch reporting that the suspect was a male with a gun.

{¶ 27} During his investigation at Circle K, one of the employees showed Rickard some surveillance video. In the video, Rickard saw the suspect enter the store, push one of the employees to the ground with a gun, and then point the gun at the employee behind the register. He described the suspect as wearing blue track pants with a white stripe, a blue hoodie, and a mask or bandanna.

{¶ 28} Later, while canvassing the area, Rickard found a black bandanna on the ground outside of a business across the street from the Circle K.

8.

{¶ 29} Rickard photographed the evidence the police seized from Haskins's backpack. In it, they found money; a billfold; a driver's license belonging to R.H., one of the Circle K employees; blue pants with a white stripe; a blue hoodie; a flashlight; black shoes; and a "NUEVO LEON" hat with a decorated bill that has two roosters on it, one that is primarily red and black and one that is primarily white, tan, and black. They also found a burr on the black shoes. There are burrs in the area around the High Level Bridge.

{¶ 30} The State offered into evidence a photograph pulled from the Circle K's surveillance system that Haskins objected to. He claimed that the State could not authenticate images from the Circle K's surveillance system because Rickard was not familiar with the way the surveillance system operated. To attempt to authenticate the image, the State elicited from Rickard that he viewed video of the robbery while he was at the Circle K; he viewed the video five to ten minutes after he arrived at the store and about 15 minutes after the robbery happened; he could not remember seeing any cameras at the store; the photograph looked like the Circle K store on Clayton Street; and the photo had a date and time stamp on it. The trial court admitted the photo over Haskins's objection. In the photo, Rickard pointed out that the robber was wearing a hat with gray, black, and red on the bill. He believed that the hat in the picture was the same hat that officers recovered from Haskins's backpack.

{¶ 31} The State also offered a second photo that Rickard claimed came from the Circle K surveillance system, but that did not have a time or date stamp. In this picture, the robber is "reaching over the counter with the till on the counter" and appears to have

9.

a gun in his hand. R.H., the person whose license was in Haskins's backpack, is standing behind the counter.

{¶ 32} On cross, Rickard admitted that no DNA was found on any of the items taken into evidence. He did not come into contact with Haskins the night of the robbery, so he did not know what Haskins was wearing when officers arrested him.

{¶ 33} Regarding the pants found in the backpack, Rickard conceded that their most notable feature was their white stripe. Although Rickard did not recall any of the witnesses mentioning a white stripe, he remembered seeing it on the surveillance video. However, the stripe was not visible on the photo of the suspect reaching over the counter.

{¶ 34} On redirect, the State asked Rickard to turn the pants inside out. When he did so, the stripe was less noticeable.

{¶ 35} Batson, Rickard's partner, testified that he responded to a call of a robbery in progress at the Circle K on Clayton Street on September 21, 2023. He spoke to four or five witnesses at the store, whom he described as "[a]nxious," "worked up," and "scared."

{¶ 36} The State played video from Rickard's body camera at trial. It shows R.H. reporting that the robber took his wallet and ID. He did not see which way the robber left.

{¶ 37} Haeuptle testified that he helped search for the robbery suspect. He was told that the suspect was "a black male wearing all blue." He encountered someone matching that description at the end of the High Level Bridge on the east side of the river.

10.

{¶ 38} Haeuptle recalled finding clothing and a wallet in Haskins's backpack, which Haskins said were his belongings. However, officers later learned that the wallet belonged to R.H.

{¶ 39} Haeuptle knew that plants with burrs were located at the base of the High Level Bridge.

{¶ 40} It was approximately one mile from the Circle K to the place where Haeuptle encountered Haskins, and he encountered Haskins approximately ten to 15 minutes after being dispatched to assist with the robbery call.

{¶ 41} During Haeuptle's testimony, the State played the same portion of Haeuptle's body camera video that it did at the suppression hearing.

{¶ 42} On cross, Haeuptle conceded that Haskins was wearing a white sweatshirt and blue jeans in the body camera video. He did not hear any reports that the robbery suspect had a backpack. He admitted that it was possible that Haskins would not have wanted to tell the police if he had found a backpack with money in it while he was walking on the bridge, and it would be against Haskins's interest to consent to a search of a bag with contraband in it.

{¶ 43} Ebright testified that he and Haeuptle spoke with someone in the parking lot of the Circle K who gave them a description of the suspect as a male wearing all blue. One person said it was a black male, and another said it was a white male. They then drove around looking for the suspect. As they were driving over the High Level Bridge from the downtown side to the east side, they saw a man walking eastbound on the bridge. They did not see anyone else walking in the area. They saw the man about 15

11.

minutes after receiving the robbery call, and he was about one-half to three-quarters of a mile from the Circle K. Ebright believed that a normal person would take about 15 minutes to walk from the Circle K to the far side of the High Level Bridge.

{¶ 44} Once the officers got to the east side of the bridge, they waited for the man to approach them, "probably said something along the lines of, hey, can we talk to you for a second, and had a consensual encounter with the male [they] encountered on the bridge." They also asked if they could search his backpack, which he consented to. Inside the backpack they found blue track pants with a white stripe, a blue top, shoes, "a baseball hat with a very distinct marking on the bill," cash, and a "checkbook cover" with credit, debit, and ID cards in it. Ebright could not remember the colors on the bill of the hat, and the officers later determined that the cards belonged to R.H.

{¶ 45} On cross, Ebright said that the description of the white stripe on the pants was given to them by the officer reviewing the store's video footage. He did not review the video himself. He agreed that it would not be in Haskins's interest to consent to the search of a bag with contraband in it, and that it was possible that Haskins found the bag while he was walking across the bridge. He recalled that Haskins was wearing a white sweatshirt and blue jeans when they saw him.

{¶ 46} Wise was the lead investigator in this case. When she first arrived at the Circle K, she secured the scene. After that, she went to look at surveillance video footage. She knew that the Circle K had cameras outside, over the front door, and over the counter, but the outside camera was not working that day. On the video, she saw a person wearing all blue with black shoes, a hood over a hat, and a gun in his right hand.

12.

She believed that she could see "a slight line down the pants" on the video, from which she concluded that the pants were on inside out. She saw the suspect enter the store and knock an employee to the ground, a girl run into the bathroom, and the suspect approach someone in the back of the store to make them come forward to get the till out of the register. She could not determine from the video if there was a vehicle the suspect might have used to get away.

{¶ 47} None of the other officers saw anyone matching the suspect's description other than Haskins. They were not able to find a gun in the area, despite an extensive search.

{¶ 48} Although there were at least five witnesses to the robbery, Wise was unable to locate two of them, one was living in Texas at the time of trial, and R.H. and another witness were afraid to come to court.

{¶ 49} R.H. told Wise that the robber "forcefully made him empty his pockets and took his belongings."

{¶ 50} On cross, Wise said that the clothes and hat did not return positive DNA matches to Haskins or anyone else. She also admitted that there were numerous roads someone leaving the Circle K could have taken.

{¶ 51} She admitted that the clothes Haskins was wearing when he was stopped were not the same as the clothes on the surveillance video.

{¶ 52} After Wise's testimony, the State rested. Haskins moved for acquittal under Crim.R. 29, which the trial court denied.

13.

{¶ 53} After deliberating, the court found Haskins guilty of all three counts of aggravated robbery and the attached firearm specifications.

## C. Sentencing

{¶ 54} At the sentencing hearing, Haskins's attorney noted that Haskins maintained his innocence of the charges and asked the court to impose minimum sentences based on Haskins's age. Counsel agreed with the court that these were Haskins's twelfth, thirteenth, and fourteenth felony convictions, Haskins had felony convictions in multiple states, and "the three-year gun specifications must be stacked on top of each other and stacked with any other sentence; in other words, that's a minimum of nine years just for the gun specifications[.]" Neither Haskins nor the State addressed the court.

{¶ 55} The trial court determined that it was "almost impossible" to overcome the presumption for prison because these were Haskins's twelfth, thirteenth, and fourteenth felony convictions. It also "note[d] that these three counts all happened in one incident, not three different robberies. This court has always felt that if you're charged with three counts of one 7-Eleven, you can't get the same sentence as you would if you robbed three 7-Elevens. Unfortunately the law is that these gun specifications must be served consecutively with each other [and] with anything else." The court ordered Haskins to serve a prison sentence of six to nine years on each robbery conviction, along with three years on each firearm specification. It ordered the sentences on counts two and three to run concurrently with count one and the firearm specifications to run consecutively to each other and to count one for an aggregate prison sentence of 15 to 18 years.

14.

{¶ 56} Haskins now appeals, raising four assignments of error:

ASSIGNMENT OF ERROR I

The trial court erred in denying Gerald Haskins' motion to suppress in violation of the Fourth and Fourteenth Amendments to the U.S. Constitution and Article 1, Section 14 of the Ohio Constitution.

ASSIGNMENT OF ERROR TWO

The trial court erred in admitting State's Exhibit's 15, 16, 17, 18, and 32, the Circle K surveillance video and still photographs purportedly taken from the video, because the exhibits were not properly authenticated.

ASSIGNMENT OF ERROR THREE

The trial court erred when it held that Ohio's sentencing scheme mandated it sentence Gerald Haskins to three consecutive firearm specifications.

ASSIGNMENT OF ERROR FOUR

Gerald Haskins received ineffective assistance of counsel when defense counsel failed to correct the trial court's misunderstanding of Ohio's firearm specification sentencing scheme.

## II. Law and Analysis

### A. The trial court properly denied Haskins's motion to suppress.

{¶ 57} In his first assignment of error, Haskins argues that the trial court erred by denying his motion to suppress. He contends that the totality of the circumstances shows that his encounter with the TPD officers was not consensual, the officers did not have the requisite suspicion to detain him, and he did not freely and voluntarily consent to the search of his backpack. Additionally, because the officers did not have a reason to stop Haskins, it was not inevitable that the police would discover the contents of his backpack. In response, the State argues that the trial court correctly denied Haskins's motion to

suppress because his initial encounter with the police was consensual; the officers had reasonable, articulable suspicion to detain him because he matched the general physical description of the robber and was the only pedestrian officers had seen in the area of the robbery; he consented to the search of his backpack; and the contents of the backpack inevitably would have been discovered incident to his arrest.

{¶ 58} Our review of a motion to suppress presents a mixed question of law and fact. *State v. Burnside*, 2003-Ohio-5372, ¶ 8. The trial court acts as the trier of fact at a suppression hearing by weighing the evidence and determining the credibility of the witnesses. *Id.* We must accept the trial court's factual findings if they are supported by competent credible evidence, and "'independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard.'" *State v. Wesson*, 2013-Ohio-4575, ¶ 40, quoting *id.*

{¶ 59} The Fourth Amendment to the United States Constitution and Article I, Section 14, of the Ohio Constitution prohibit unreasonable searches and seizures. In the context of constitutional protections, a police officer's interaction with a citizen can fall into one of three categories: (1) arrest, (2) investigative (or *Terry*) stop, or (3) consensual encounter. *State v. Watkins*, 2021-Ohio-1443, ¶ 19 (6th Dist.). Two of the three types of encounters—arrests and investigatory stops—require the officer to have some justification for his contact with the citizen.

{¶ 60} For an arrest, the officer must have probable cause. *State v. Barner*, 2002 WL 737065, *1 (6th Dist. Apr. 26, 2002). "Probable cause exists when circumstances would warrant a prudent person to believe that a suspect has committed an offense." *Id.* 16.

{¶ 61} For an investigatory stop, the officer must have a reasonable, articulable suspicion that criminal activity is occurring. *State v. Mesley*, 134 Ohio App.3d 833, 840 (6th Dist. 1999), citing *United States v. Brignoni-Ponce*, 422 U.S. 873 (1975). Reasonable, articulable suspicion is more than a hunch, but considerably less than the evidence needed to show proof by a preponderance of the evidence or probable cause. *Kansas v. Glover*, 589 U.S. 376, 380 (2020). Whether an officer had reasonable, articulable suspicion to detain a person is based on the totality of the circumstances as "'viewed through the eyes of the reasonable and prudent police officer on the scene who must react to events as they unfold.'" *State v. Hairston*, 2019-Ohio-1622, ¶ 10, quoting *State v. Andrews*, 57 Ohio St.3d 86, 87-88 (1991).

{¶ 62} "An individual is subject to an investigatory detention when, in view of all the circumstances surrounding the incident, by means of physical force or show of authority, a reasonable person would have believed that he was not free to leave or is compelled to respond to questions." *State v. Lewis*, 2009-Ohio-158, ¶ 22 (2d Dist.), citing *United States v. Mendenhall*, 446 U.S. 544, 553 (1980); and *Terry v. Ohio*, 392 U.S. 1, 16, 19 (1968). This constitutes a seizure for purposes of the Fourth Amendment. *State v. Westover*, 2014-Ohio-1959, ¶ 16 (10th Dist.).

{¶ 63} A consensual encounter, on the other hand, does not require either the probable cause necessary for an arrest or the reasonable, articulable suspicion of criminal activity necessary for an investigatory stop, and does not implicate constitutional protections against unreasonable searches and seizures. *Watkins* at ¶ 22.

17.

{¶ 64} An interaction is considered a consensual encounter if an officer approaches someone in public to engage them in conversation or request information, as long as the person is free to decline the officer's request and walk away. *Id.* The officer may ask for a person's identification or search their belongings during a consensual encounter, and he need not inform the person that they may decline the request and walk away. *Id.* A consensual encounter turns into an investigative stop when a reasonable person would no longer feel free to leave based on the officer's use of force or show of authority. *State v. Escobedo*, 2023-Ohio-3410, ¶ 40 (6th Dist.).

{¶ 65} In this case, Haskins's interaction with the officers began as a consensual encounter. Although Haeuptle saying, "hey man, do me a favor and come on over here for a second" was arguably more of a command than a request, the officers did not use physical force or make a show of authority that would have made a reasonable person believe that they were not free to continue walking or were required to answer questions. *Lewis* at ¶ 22. However, the encounter turned into an investigatory detention when Ebright asked Haskins to walk over to the cruiser and stood behind him. At that point, a reasonable person in Haskins's position would not have felt free to leave the situation based on Ebright's show of authority, i.e., his order to step over to the cruiser and physical presence close behind them. This is also the point when Haeuptle took control of Haskins's backpack, and a reasonable person would not feel free to leave the situation when the officer had control of their possessions. *See State v. Mallory*, 2020-Ohio-4848, ¶ 25 (2d Dist.) (consensual encounter with a bus passenger morphed into an investigatory detention when officer "took control of" passenger's backpack). Thus, the officers must

18.

have had a reasonable, articulable suspicion that Haskins was involved in criminal activity by the time Ebright told him to step over to the cruiser.

{¶ 66} Based on the information presented at the suppression hearing, we find that the officers did not have reasonable, articulable suspicion of criminal activity when they detained Haskins. Detaining a person based on a vague description that contains little more than basic demographic information is not constitutionally sufficient. *State v. Williams*, 2024-Ohio-943, ¶ 48, 60 (7th Dist.); *In re D.W.*, 2009-Ohio-5406, ¶ 32 (2d Dist.). In *Williams*, for example, the suspects were described to the officer as black males, one who was wearing a blue shirt tee-shirt and two who were wearing white tee-shirts. *Williams* at ¶ 6. The officer found three men matching that vague description near—but not at—the location of the reported crime. *Id.* at ¶ 7. The defendant was one of the men, and when the officer patted him down, he found a gun. *Id.* at ¶ 10. The Seventh District found that the officer lacked reasonable, articulable suspicion to detain the defendant based solely on a description that was "very general, and included no real distinguishing characteristics other than the color of their shirts and that there were three of them." *Id.* at ¶ 60.

{¶ 67} Although this case varies from *Williams* slightly because it involves citizen informants, who are presumed to be more reliable than the anonymous informant in *Williams*, *State v. Long*, 2020-Ohio-4090, ¶ 24-25 (6th Dist.), the fact remains that the description the officers used was equally vague. Even more troubling in this case is the fact that Haskins did not match the incredibly vague description of the suspect *at all* beyond being a black man. Haskins's proximity to the crime scene does not support the

19.

officers' claim of reasonable suspicion, either, because proximity to the crime is not enough to create reasonable suspicion. *See D.W.* at ¶ 32. In short, the facts that the officers pointed to as support for their suspicion of Haskins do not stand up to constitutional scrutiny.

{¶ 68} Having determined that Haskins was unlawfully detained, we must next determine whether the unlawful detention negated his consent to search his backpack. "Once an individual has been unlawfully detained by law enforcement, for his or her consent to be considered an independent act of free will, the totality of the circumstances must clearly demonstrate that a reasonable person would believe that he or she had the freedom to refuse to answer further questions and could in fact leave." *State v. Robinette*, 80 Ohio St.3d 234 (1997), paragraph three of the syllabus, citing *Florida v. Royer*, 460 U.S. 491 (1983); and *Schneckloth v. Bustamonte*, 412 U.S. 218 (1973). Here, as already discussed, Ebright's show of authority and blocking of Haskins's path, combined with Haeuptle's seizure of his backpack, would make a reasonable person feel like they were not free to leave. Thus, Haskins's consent was not an act of free will independent of the illegal seizure.

{¶ 69} However, we cannot find that the trial court erred by denying Haskins's motion to suppress because the officers would have inevitably discovered the evidence in Haskins's backpack when they arrested him on the outstanding warrant. Under the inevitable discovery doctrine, evidence obtained in violation of the Fourth Amendment is still admissible if the state can prove by a preponderance of the evidence "that the evidence would have been ultimately or inevitably discovered during the course of a

20.

lawful investigation." *State v. Perkins*, 18 Ohio St.3d 193 (1985), syllabus. The state has "the burden to show within a reasonable probability that police officials would have discovered the derivative evidence apart from the unlawful conduct." *Id.* at 196.

{¶ 70} Here, the evidence shows that, once the officers knew Haskins's identity, they would have ultimately arrested Haskins on his outstanding warrant whether they unlawfully detained him or not. Therefore, there is a reasonable probability that Haskins's backpack would have been subject to a search incident to his lawful arrest. *Arizona v. Gant*, 556 U.S. 332, 339 (2009) (a law enforcement officer who has made a lawful arrest may conduct a warrantless search of the arrestee's person and the area within the arrestee's immediate control, which includes "the area from within which he might gain possession of a weapon or destructible evidence" (Internal quotation omitted.)). That being the case, the officers inevitably would have discovered the evidence in the backpack when they searched it after arresting Haskins. Thus, the evidence is not required to be suppressed, and the trial court did not err by denying Haskins's motion to suppress. Haskins's first assignment of error is not well-taken.

### B. The trial court properly admitted the surveillance videos and photos.

{¶ 71} In his second assignment of error, Haskins argues that the trial court abused its discretion by admitting video and still photos taken from the Circle K's surveillance system because none of the State's witnesses was able to authenticate the surveillance video. He contends that Rickard's testimony about the video and photos did not establish that the video was reliable, which was necessary to authenticate the video under Evid.R. 21.

901. The State responds that Rickard's testimony confirmed that he viewed the surveillance videos while he was at Circle K, the photographs accurately depicted the surveillance video, and the layout in the photographs matched the interior of the Circle K, which was sufficient to authenticate the video. Additionally, Batson's body camera, which he authenticated, recorded portions of the store that "should be considered to offer an alternative source of information corroborating the accuracy of the surveillance videos."

{¶ 72} A trial court has broad discretion to admit or exclude evidence, and we review its decisions for abuse of discretion. *State v. Whites Landing Fisheries, LLC*, 2017-Ohio-7537, ¶ 42 (6th Dist.). Abuse of discretion means that the trial court's decision was unreasonable, arbitrary, or unconscionable. *State ex rel. Askew v. Goldhart*, 75 Ohio St.3d 608, 610 (1996).

{¶ 73} Authentication of evidence is governed by Evid.R. 901 and requires the proponent of the evidence to demonstrate "that the matter in question is what its proponent claims." *In re. C.G.*, 2023-Ohio-4239, ¶ 44 (6th Dist.). The threshold for authentication is very low, which "'reflects an orientation of the rules toward favoring the admission of evidence.'" *Id.* at ¶ 46, quoting *State v. Giles*, 2021-Ohio-2865, ¶ 31 (6th Dist.). The standard for admission under Evid.R. 901 does not require conclusive proof of authenticity. *Giles* at ¶ 31.

{¶ 74} "[T]he showing of authenticity is not on a par with more technical evidentiary rules, such as hearsay exceptions, governing admissibility." (Brackets in original and internal quotation omitted.). *State v. Gibson*, 2015-Ohio-1679, ¶ 45 (6th

22.

Dist.). Instead, the proponent of the evidence must make only a prima facie showing of authenticity. *Id.* Once the proponent makes that prima facie showing, the evidence should be admitted. *Id.* At that point the burden shifts to the opponent of the evidence to rebut the prima facie showing by presenting evidence that raises questions about the evidence's genuineness. *Id.* Ultimately, the trier of fact determines authenticity. *Id.*

{¶ 75} Photo and video evidence is admissible under two theories, the "pictorial testimony" theory and the "silent witness" theory. The pictorial testimony theory applies when the evidence is illustrative of a witness's testimony and the witness can testify that the evidence is a fair and accurate representation of what is depicted, based on the witness's personal observations. *Midland Steel Prods. Co. v. U.A.W. Local 486*, 61 Ohio St.3d 121, 129 (1991), citing *Fisher v. State*, 7 Ark.App. 1, 5-6 (1982). The silent witness theory applies when "'the photographic evidence is a "silent witness" which speaks for itself, and is substantive evidence of what it portrays independent of a sponsoring witness.'" *Id.*, quoting *Fisher* at 5-6. There were no witnesses to the robbery who testified at trial, so the pictorial testimony theory cannot apply in Haskins's case.

{¶ 76} The trial court properly authenticated the video and photographs under the silent witness theory, however. The trial court heard testimony from Rickard that he reviewed surveillance video at Circle K approximately 15 minutes after the robbery occurred, the photographs pulled from the video appeared to depict the interior of the Circle K as it appeared that night, and the date and time stamp on one of the photos matched the date and time the robbery was reported. It also heard testimony from Wise that she reviewed the surveillance video within about 15 minutes of the robbery, she was

23.

familiar with the Circle K and knew where the store's cameras were located, and the video admitted into evidence was a fair and accurate depiction of the recording she viewed on the night of the robbery. The testimony of officers who viewed surveillance video is sufficient to meet the low standard for authentication. *See, e.g., State v. Gibson*, 2023-Ohio-2481, ¶ 88-90 (8th Dist.) (officer's testimony about obtaining and reviewing videos was sufficient to authenticate the videos, even without testimony that the videos were accurate depictions of events); *State v. Freeze*, 2012-Ohio-5840, ¶ 69-70 (12th Dist.) (videos were properly authenticated by testimony from police officers who obtained the videos from businesses and testified that the videos were accurate representations of the videos that they viewed at the businesses); *State v. Smith*, 2024-Ohio-2416, ¶ 13, 31-32 (5th Dist.) (videos were properly authenticated by police chief who requested the videos from a gas station and knew that the gas station had a working surveillance system).

{¶ 77} Because Rickard and Wise both testified that they viewed the surveillance videos at the Circle K the night of the robbery, the videos contained a time and date stamp that matched the time and date of the robbery, and Wise testified that she was familiar with Circle K's surveillance system, the State presented sufficient evidence to authenticate the videos. Therefore, the trial court did not abuse its discretion by admitting them at trial, and Haskins's second assignment of error is not well-taken.

## C. The trial court erred by imposing three mandatory firearm specifications.

{¶ 78} In his third assignment of error, Haskins argues that the trial court erred by sentencing him to serve three consecutive prison terms for the firearm specifications

24.

attached to his aggravated robbery convictions. He contends, under R.C. 2929.14(B)(1)(g) and *State v. Beatty*, 2024-Ohio-5684, that consecutive sentences were mandatory only for the first two firearm specifications, but the trial court misunderstood the law and imposed mandatory, consecutive sentences for all three firearm specifications. The State responds that the record does not support a finding that Haskins's sentence is clearly and convincingly contrary to law. More specifically, the trial court's subjective belief about the law does not render a sentence that is authorized by law contrary to law. The State also asks us to reject the reasoning in the plurality opinion in *Beatty* and find that all three of the prison terms for Haskins's firearm specifications are mandatory.

{¶ 79} We review felony sentencing challenges under R.C. 2953.08(G)(2). *State v. Kleinhans*, 2023-Ohio-2621, ¶ 24 (6th Dist.). Under that statute, an appellate court "may increase, reduce, or otherwise modify a sentence that is appealed under this section or may vacate the sentence and remand the matter to the sentencing court for resentencing" only if it clearly and convincingly finds either of the following:

> (a) That the record does not support the sentencing court's findings under division (B) or (D) of section 2929.13, division (B)(2)(e) or (C)(4) of section 2929.14, or division (I) of section 2929.20 of the Revised Code, whichever, if any, is relevant;

> (b) That the sentence is otherwise contrary to law.

R.C. 2953.08(G)(2). None of the statutes in R.C. 2953.08(G)(2)(a) is applicable to Haskins's case, so we can only vacate and remand Haskins's sentence if we find that it is otherwise contrary to law.

{¶ 80} Generally speaking, a trial court is prohibited from imposing more than one prison term for multiple firearm specifications that were committed as part of the same act or transaction. R.C. 2929.14(B)(1)(b); *State v. Tellis*, 2020-Ohio-6982, ¶ 84 (6th Dist.). However, R.C. 2929.14(B)(1)(g) serves as an exception to the rule that multiple firearm specifications must be merged for purposes of sentencing when the predicate offenses were committed as a single criminal transaction. *State v. Welninski*, 2018-Ohio-778, ¶ 101 (6th Dist.). That statute provides,

> If an offender is convicted of . . . two or more felonies, if one or more of those felonies are . . . aggravated robbery, . . . and if the offender is convicted of . . . a specification of the type described under [R.C. 2941.145] in connection with two or more of the felonies, the sentencing court *shall* impose on the offender the prison term specified under [R.C. 2929.14](B)(1)(a) . . . for each of the two most serious specifications of which the offender is convicted . . . and, *in its discretion, also may* impose on the offender the prison term specified under that division for any or all of the remaining specifications.

(Emphasis added.) R.C. 2929.14(B)(1)(g). Thus, under the plain language of the statute, when an offender is convicted of two or more felonies that include firearm specifications, at least one of which (like aggravated robbery) is specified in the statute, the sentencing court is required to impose separate, mandatory sentences for the two most serious specifications. *Welninski* at ¶ 102. Beyond that, the sentencing court has *discretion*—but is not *required*—to impose sentences for any remaining specifications. *Id.*

{¶ 81} In this case, the transcript from the sentencing hearing makes clear that the trial court believed that it was required to impose sentences for all three firearm specifications. Immediately before sentencing Haskins, the court said,

26.

I will note that these three counts all happened in one incident, not three different robberies. This court has always felt that if you're charged with three counts of one 7-Eleven, you can't get the same sentence as you would if you robbed three 7-Elevens. Unfortunately the law is that these gun specifications must be served consecutively with each other [and] with anything else.

It then went on to impose sentences for each of the three firearm specifications that Haskins was convicted of. A trial court's imposition of sentence for a firearm specification under the mistaken belief that the sentence is mandatory is error. *State v. Williamson*, 2019-Ohio-4380, ¶ 68 (6th Dist.). Accordingly, we find that the trial court erred in this case by imposing sentences for three firearm specifications under the mistaken belief that all three were mandatory. Therefore, we find that Haskins's third assignment of error is well-taken.

### D. Haskins's fourth assignment of error is moot.

{¶ 82} In his fourth assignment of error, Haskins argues that his trial counsel was ineffective because counsel failed to correct the trial court's mistaken belief about the mandatory nature of the firearm specifications. Our resolution of Haskins's third assignment of error has rendered this assignment of error moot and it is, therefore, not well-taken.

### III. Conclusion

{¶ 83} Based on the foregoing, the June 21, 2024 judgment of the Lucas County Court of Common Pleas is affirmed in part, reversed in part, and remanded for resentencing. At the resentencing hearing, the trial court shall impose consecutive sentences for two of the firearm specifications and use its discretion to determine if it is

27.

appropriate to impose a sentence for the third firearm specification, as outlined in R.C. 2929.14(B)(1)(g). The parties are ordered to divide the costs of this appeal equally under App.R. 24.

Judgment affirmed in part, reversed in part, and remanded for resentencing.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Christine E. Mayle, J.

JUDGE

Myron C. Duhart, J.
CONCUR.

JUDGE

Charles E. Sulek, J.
CONCURS AND WRITES
SEPARATELY.

JUDGE

**SULEK, J., concurring.**

**{¶ 84}** I concur with the decision of the majority. I write separately concerning Haskins's first assignment of error because I believe that the officers' initial encounter with Haskins was an investigatory stop that was supported by reasonable, articulable suspicion.

**{¶ 85}** "A consensual encounter is one in which the person is free to walk away from police without answering, and generally occurs in a public place for the purpose of a conversation, or for police to ask for information or seek permission to conduct a search."

28.

*State v. Escobedo*, 2023-Ohio-3410, ¶ 39 (6th Dist.). "Any restraint of a person's liberty by physical force or display of authority by police negates the consensual nature of the contact." *Id.*, quoting *State v. Knicely*, 2014-Ohio-3437, ¶ 9 (6th Dist.). "The determination of whether a reasonable person would feel free to walk away is based on the totality of the circumstances of that case." *Knicely* at ¶ 9, citing *United States v. Mendenhall*, 446 U.S. 544, 554 (1980).

{¶ 86} Here, I do not believe that a reasonable person in Haskins's position would have felt free to ignore Officers Haeuptle and Ebright and continue walking away. The encounter occurred just after midnight and Haskins was the only person around. As he was walking across the bridge, the officers drove past him. They parked their patrol cruiser on the other side of the bridge and got out of it as Haskins was approaching. Haeuptle called out to Haskins, "Hey man do me a favor and come on over here for a second." When Haskins came over, Haeuptle approached him from Haskins's right side while Ebright approached him from the left. The officers did not identify themselves and Haeuptle immediately asked Haskins where he was coming from.

{¶ 87} Contrast these facts with those in *State v. Lewis*, 2009-Ohio-158 (2d Dist.), in which the Second District found that a consensual encounter occurred where around 5:45 p.m. the officers approached three individuals who were standing near a van that contained pit bulls in crates. The officers identified themselves, asked permission to speak with the individuals, and asked what was happening with the dogs. *Id.* at ¶ 4. After getting one of the individual's information, the officers permitted him to leave. *Id.*

29.

{¶ 88} In this case, the fact that the officers waited for Haskins to come across the bridge, approached him after midnight while he was alone, gave him a directive to come over to them, encircled him, and asked him questions without introducing themselves or asking for permission, constituted a show of authority that negated the consensual nature of the encounter. I, therefore, would hold that the initial stop of Haskins constituted an investigatory stop that required reasonable, articulable suspicion.

{¶ 89} "The Fourth Amendment permits brief investigative stops . . . when a law enforcement officer has 'a particularized and objective basis for suspecting the particular person stopped of criminal activity.'" *State v. Hale*, 2024-Ohio-4866, ¶ 15, quoting *Navarette v. California*, 572 U.S. 393, 396 (2014), quoting *United States v. Cortez*, 449 U.S. 411, 417-418 (1981). "The level of suspicion must be more than a 'mere hunch' that something criminal is afoot, but it need not rise to 'proof of wrongdoing by a preponderance of the evidence"; the required standard of proof is 'obviously less than is necessary for probable cause.'" *Id.*, quoting *Navarette* at 397. "When deciding whether reasonable suspicion existed to justify an investigatory stop, courts look at the totality of the circumstances of the stop 'to see whether the [law-enforcement] officer [had] a "particularized and objective basis" for suspecting legal wrongdoing.'" *Id.*, quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002), quoting *Cortez* at 417. The determination must be "viewed through the eyes of the reasonable and prudent police officer on the scene who must react to events as they unfold." *State v. Hairston*, 2019-Ohio-1622, ¶ 10, quoting *State v. Andrews*, 57 Ohio St.3d 86, 87-88 (1991). "An

30.

assessment of the totality of the circumstances 'does not deal with hard certainties, but with probabilities.'" *Id.*, quoting *Cortez* at 418.

{¶ 90} In *Hairston*, the Ohio Supreme Court held that an officer who personally heard the sound of gunshots, at night, in an area that he knew had a reputation for criminal activity, had reasonable suspicion to stop the only person who was in the area from where he believed the gunshots originated 30 to 60 seconds earlier. *Id.* at ¶ 12-14. In so holding, the Ohio Supreme Court cautioned that "[t]he court of appeals went astray by focusing on individual factors in isolation rather than on the totality of the circumstances." *Id.* at ¶ 15, citing *Arvizu* at 274. The court of appeals also "erred in refusing to give any weight to the contextual factors asserted by the state." *Id.*

{¶ 91} Here, factors exist beyond the vague physical description of the suspect and Haskins's proximity to the crime. In addition to Haskins matching the description of a black male and being found approximately one-half mile down the street from the crime scene approximately 20 minutes later, the facts also include that he was the only person in the area, he was seen walking away from the direction of the crime carrying a backpack, and he was walking alone across the bridge shortly after midnight, which the investigating officers stated was not a common behavior.

{¶ 92} And although Haskins was wearing different clothes than the alleged robber, I do not find that sole factor to be dispositive. The officers in this case stopped someone who met the general physical description of the suspect. Further, it is not unreasonable to believe that a criminal would quickly change clothes after committing the crime. Indeed, a person should not be able to categorically preclude the police from

31.

developing reasonable suspicion to stop him simply by undergoing a wardrobe change. Instead, the focus must remain on the totality of the circumstances.

{¶ 93} The majority, in its determination that reasonable suspicion did not exist, relies on two cases. In *State v. Williams*, 2024-Ohio-943 (7th Dist.), the officers responded to an anonymous report of three black males waving guns and having an altercation with another male in a silver vehicle in a car wash parking lot. In holding that the officers did not have reasonable suspicion to stop three black males who were wearing similar clothing as reported by the anonymous caller and who were located 44 yards away from the car wash, the Seventh District cited numerous cases discussing the credibility of an anonymous source detailing that criminal conduct occurred. *See Williams* at ¶ 49-57. One of those cases was *In re D.W.*, 2009-Ohio-5406 (2d Dist.), also relied upon by the majority, which the Seventh District found was "similar to the instant case." *Williams* at ¶ 54.

{¶ 94} In *In re D.W.*, the police officer received a dispatch of an anonymous report of shots being fired and men arguing in the street. *In re D.W.* at ¶ 3. The officer approached the area and found four young men walking on the side of the street. *Id.* at ¶ 4. The young men were not yelling, and the officer did not observe a firearm in their possession. *Id.* at ¶ 6. D.W. was one of the young men. On appeal, the Second District recognized that the issue before it was "whether the police had a reasonable, articulable suspicion that D.W. was armed." *Id.* at ¶ 32. In holding that reasonable, articulable suspicion did not exist, the Second District reasoned that the tipster was not a known or identified informant, there was no evidence corroborating the tip, none of the young men 32.

were yelling or in observable disagreement, and D.W. did not make any furtive movements suggestive of illegal conduct. *Id.* It concluded, "In other words, the juveniles were just walking together down the street, certainly not a remarkable occurrence given the relatively early hour of the evening. The fact that they were in a high crime area standing alone does not create reasonable suspicion of criminal activity." *Id.*

{¶ 95} Notably, *Hairston* distinguished *In re D.W.*, stating that it was "not a case in which the officers relied on a radio dispatch or other secondhand information about shots being fired, *e.g.*, *In re D.W.*, 184 Ohio App.3d 627, 2009-Ohio-5406, 921 N.E.2d 1114, ¶ 32 (2d Dist.), but one in which they heard and immediately reacted to the sound of nearby gunfire." *Hairston*, 2019-Ohio-1622, at ¶ 11.

{¶ 96} Like *Hairston*, the present case is also distinguishable from *In re D.W.*— and also *Williams*—in that an anonymous tip was not the source that supported the element of criminal activity. Here, Officers Haeuptle and Ebright responded to the scene of the armed robbery and spoke with the victims firsthand. Thus, unlike *Williams* and *In re D.W.*, the only consideration before the court was whether Haskins could reasonably be suspected to be the robber, not whether any criminal activity occurred in the first instance.

{¶ 97} In this case, an armed robbery occurred close to midnight, and the suspect fled on foot. He was described as a black male wearing an all-blue jumpsuit and black shoes. The officers began to canvass the area and initially did not find anyone walking on foot. As they continued their search, the only person they observed was Haskins. He was approximately one-half mile further down the street from the scene of the robbery,

33.

traveling away from it. When the officers saw him, he was walking across the bridge over the Maumee River approximately 20 minutes after the robbery. Haskins fit the general physical description given by the victims. He was wearing different clothes but carried a backpack. And although the bridge was open to pedestrian traffic, it was uncommon for anyone to walk across it at that time of night.

{¶ 98} While each of these factors alone may be insufficient to justify conducting a stop, when viewed in their totality, they demonstrate that the officers were not acting merely on an "inchoate or unparticularized suspicion or 'hunch.'" *United States v. Sokolow*, 490 U.S. 1, 7 (1989), quoting *Terry v. Ohio*, 392 U.S. 1, 27 (1968). I find instead that the officers had reasonable, articulable suspicion to believe that the individual on the bridge was the suspect from the armed robbery. *See State v. Carter*, 2022-Ohio-91, ¶ 55-56 (2d Dist.) (reasonable, articulable suspicion existed to stop the defendant when the officers responded to the area of a ShotSpotter alert, the defendant was observed in the specific area within four minutes of the alert, it was almost 1:00 a.m., the defendant was the only person in the area, and he "canted his body in such a manner that [the officers] were unable to observe his right side").

{¶ 99} I, therefore, would hold that the trial court did not err when it found that the officers lawfully conducted a *Terry* stop of Haskins.

{¶ 100} Finally, because the stop was lawful, I would find that Haskins voluntarily consented to the search of his backpack when Haueptle asked "Do you care if I look?" and Haskins responded, "No."

34.

**{¶ 101}** For these reasons, I would affirm the decision of the trial court denying

Haskins's motion to suppress.  Accordingly, I respectfully concur.

This decision is subject to further editing by the Supreme Court of
Ohio's Reporter of Decisions.  Parties interested in viewing the final reported
version are advised to visit the Ohio Supreme Court's web site at:
http://www.supremecourt.ohio.gov/ROD/docs/.